Case No. 13-1334

# United States Court of Appeals
# for the Federal Circuit

ARNETT FACIAL RECONSTRUCTION COURSES, INC., a
California Corporation

*Plaintiff-Appellant,*

v.

PATTERSON DENTAL SUPPLY, INC. a Minnesota corporation,
d/b/a DOLPHIN IMAGING AND MANAGEMENT SOLUTIONS,
and
DOES 1 through 10, inclusive,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Central District of California
Honorable Consuelo B. Marshall
Case No. 2:11-CV-06929-CBM (Ex)

**CORRECTED
APPELLANT'S BRIEF**

Roger N. Behle, Jr., SBN 174755
Justin P. Karczag, SBN 223764
Foley Bezek Behle & Curtis, LLP
575 Anton Blvd., Suite 710
Costa Mesa, California 92626
Telephone: (714)556-1700
Facsimile: (714) 546-5005

Counsel for Plaintiff-Appellant
Arnett Facial Reconstruction Courses, Inc.

## **CERTIFICATE OF INTEREST**

Counsel for the Appellant, Roger N. Behle, Jr., certifies the following:

1. The full name of every party or amicus represented by me is:
Arnett Facial Reconstruction Courses, Inc.

2. The name of the real party in interest represented by me is:
Arnett Facial Reconstruction Courses, Inc.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:
None.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:
Foley Bezek Behle & Curtis LLP (law firm) ("FBBC"), Roger N. Behle, Jr. (FBBC Partner), Justin P. Karczag (FBBC Partner), Stephanie Hanning (Former FBBC Associate), Robert S. Patterson Law Office, Robert S. Patterson (Partner at Robert S. Patterson Law Office)

# TABLE OF CONTENTS

**CERTIFICATE OF INTEREST** .......................................................... i

**TABLE OF CONTENTS** ................................................................ ii

**TABLE OF AUTHORITIES** ........................................................... iv

**STATEMENT OF RELATED CASES** ............................................... x

**JURISDICTIONAL STATEMENT** ................................................... 1

**STATEMENT OF THE ISSUES** ...................................................... 2

**STATEMENT OF THE CASE** .......................................................... 3

**STATEMENT OF FACTS** ............................................................... 8

   1.   Arnett Assigns His Patents to AFRC. ........................................... 8

   2.   Patterson Acquires Dolphin with Knowledge of AFRC's Patents. ............... 9

   3.   Patterson Infringes AFRC's Patents. ........................................... 10

   4.   Procedural History and the Court's Orders. .................................... 12

     a.   The Discovery Was Divided Into Two Phases. ........................... 12

     b.   The District Court Grants Patterson's Motion for
        Summary Judgment. ......................................................... 12

     c.   AFRC Discovered New Evidence Relevant To The District
        Court's Ruling on Summary Judgment, But AFRC's
        Reconsideration Motion is Denied. ........................................ 18

     d.   Patterson's Position Throughout Litigation Was That The
        2001 Agreement was Not a Patent License. ............................... 19

     e.   AFRC Was Diligent in Discovering Evidence Despite
        Patterson's Attempts to Suppress The Evidence. ......................... 19

     f.   The District Court Denied AFRC's Motion for Reconsideration. ........... 23

**SUMMARY OF THE ARGUMENT** ...................................................23

**ARGUMENT** ...........................................................................26

1. Standard of Review. ...........................................................26

2. Legal Argument ..................................................................27

   a. Patterson's Summary Judgment Motion Should Have
      Been Denied. ................................................................27

   b. A Patent License – such as the License Between Arnett
      and Dolphin to Practice the Patents-in-Suit – is Not Assignable
      Without Permission From the Patent Holder – AFRC. ...........37

   c. The District Court Erred in Disposing of The Entire Action. .................45

   d. The District Court Erred in Sustaining Patterson's Objections. .............46

3. Alternatively, AFRC's Reconsideration Motion Should Have
   Been Granted. ..................................................................48

   a. AFRC's Evidence Relied on in its Motion for Reconsideration
      was "Newly Discovered" Evidence. ....................................48

   b. AFRC was Diligent in Discovering the New Evidence. ..........52

   c. The Evidence Regarding the 3-M Unitek Contract Would
      Have Changed The Outcome of the Case. .............................52

**CONCLUSION AND STATEMENT OF RELIEF SOUGHT** .........................56

**ADDENDUM** ..........................................................................57

**CERTIFICATE OF SERVICE** ....................................................84

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)** ..............................85

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*,

    960 F.2d 1020 (Fed. Cir. 1992)............................................................ 18, 40, 41

*Aadventure Products, Inc. v. Simply Smashing, Inc.*,

    2007 WL 2775128 (S.D. Cal. 2007) ....................................................... 41, 44, 45

*Aronson v. Quick Point Pencil Co.*,

    440 U.S. 257 (1979) ........................................................................ 16, 30, 33, 34

*Augustine Medical, Inc. v. Progressive Dynamics, Inc.*,

    194 F.3d 1367 (Fed. Cir. 1999)............................................................................27

*Bancroft v. Scribner*,

    72 F. 988 (9th Cir. 1896)....................................................................................33

*Beaty v. Selinger,*

    306 F.3d 914 (9th Cir. 2002)...............................................................................54

*Board of Trustees of Bay Medical Center v.*
*Humana Military Healthcare Services, Inc.*,

    447 F.3d 1370 (Fed. Cir. 2006)...........................................................................27

*Bonito Boats v. Thunder Craft Boats*,

    489 U.S. 141 (1989) ........................................................................... 24, 35, 36

*Chitkin v. Lincoln Nat. Ins. Co.*,

    879 F.Supp. 841 (S.D. Cal., 1995).......................................................................54

*Comer v. Micor, Inc.*,

   436 F.3d 1098 (9th Cir. 2006)..........................................................................18

*Ellenburg v. Brockway, Inc,*.

   763 F.2d 1091 (9th Cir. 1985)..........................................................................54

*Engelhard Indus. v. Research Instrumental Corp.*,

   324 F.2d 347 (9th Cir. 1963)...........................................................................49

*Forest Labs, Inc. v. Abbott Labs.*,

   339 F.3d 1324 (Fed. Cir. 2003).......................................................................40

*Frederick S. Wyle P.C. v. Texaco, Inc.*,

   764 F.2d 604 (9th Cir. 1985).....................................................................26, 49

*Fuller v. M.G. Jewelry*,

   950 F.2d 1437 (9th Cir. 1991)..........................................................................27

*Galbraith v. Resurgent Capital Servs.*,

   2006 WL 2990163 (E.D. Cal. Oct. 19, 2006) ................................................18

*Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.*,

   60 F.3d 770 (Fed. Cir. 1995)...........................................................................44

*Haglund v. Dow Chemical Co.*,

   1982 U.S. Dist. LEXIS 10109 (E.D. Cal. Apr. 7, 1982).............................25, 36

*Hall v. Aqua Queen Mfg., Inc.*,

   93 F.3d 1548 (Fed. Cir. 1996)..........................................................................44

*Hilgraeve Corp. v. Symantec Corp.*,

  265 F.3d 1336 (Fed. Cir. 2001)............................................................. 25, 46, 53

*Illinois Tool Works, Inc. v. MOC Products Co., Inc.*,

  856 F.Supp.2d 1156 (S.D. Cal. 2012)................................................................40

*In re CFLC, Inc.*,

  1994 U.S. Dist. LEXIS 14382 (N.D. Cal. Oct. 7, 1994)......................................34

*Intel Corp. v. Broadcom Corp.*,

  173 F. Supp. 2d 201 (D. Del. 2001)............................................................ 24, 29

*Jacobs v. Nintendo of America, Inc.*,

  370 F.3d 1097 (Fed. Cir. 2004)............................................................ 16, 30, 31

*Jamesbury Corp v. Litton Indus. Prods., Inc.*,

  839 F.2d 1544, 1555 (Fed. Cir. 1988)................................................................18

*Metallizing Engineering Co. v. Kenyon Bearing & Auto Parts Co.*,

  153 F. 2d 516 (2nd Cir. 1946)................................................................35

*Multnomah, Or. V. ACandS, Inc.*,

  5 F.3d 1255 (1993)................................................................27

*Oliver v. Knowles*,

  2008  Dist. LEXIS 42877 (E.D. Cal. 2008)........................................................49

*Operating Engineers Local Union No. 3 v. Burroughs*,

  417 F.2d 370 (9th Cir. 1969)................................................................54

*Painton & Co. v. Bourns, Inc.*,

  442 F.2d 216 (2d Cir. 1971)................................................................43

*Perry v. Sera*,

    623 A.2d 1210 (D.C. Cir. 1993) ......................................................................1

*Playtex Products, Inc. v. Procter & Gamble Co.*,

    400 F.3d 901 (Fed. Cir. 2005)......................................................................1

*Raber v. Pittway Corp.*,

    1994 WL 374542 (N.D. Cal. July 11, 1994).......................................................18

*School Dist. No. 1J Multnomah County, Or. v. ACandS, Inc.*,

    139 F.R.D. 164 (D.Or., 1991) ..........................................................................49

*Serrano v. Telular Corp.*,

    111 F.3d 1578 (Fed. Cir. 1997)........................................................................27

*SQL Solutions v. Oracle Corp.*,

    1991 U.S. Dist. LEXIS 21097 (N.D. Cal. Dec. 18, 1991)....................................38

*Standard Sewing Mach. Co. v. Jones*,

    260 F. 170 (3rd Cir. 1919) ........................................................ 16, 30, 32

*State Contracting & Eng'g Corp. v. Florida*,

    258 F.3d 1329 (Fed.Cir. 2001)........................................ 25, 36, 45, 53

*Trentacosta v. Frontier Pac. Aircraft Indus.*,

    813 F.2d 1553 (9th Cir. 1987).........................................................................49

*TriMed, Inc. v. Stryker Corp.*,

    608 F.3d 1333 (Fed. Cir. 2010)........................................................................27

*Unarco Industries, Inc. v. Kelley Co.*,

   465 F.2d 1303 (7th Cir. 1972)........................................................................ 24, 38

*Wang Laboratories, Inc. v. Mitsubishi Electronics America, Inc.*,

   103 F.3d 1571 (Fed. Cir. 1997),................................................................40

*Windbond Elecs. Corp. v. Int'l Trade Comm'n*,

   262 F.3d 1363 (Fed. Cir. 2001)................................................................. 18, 40

## STATE CASES

*Boehm v. Spreckels*,

   183 Cal. 239 (1920)........................................................................33

*Chandler v. Roach*,

   156 Cal.App.2d 435 (1957)................................................................36

*Rokos v. Peck*,

   182 Cal.App.3d 604 (1986)................................................................37

*Stanley v. Columbia Broadcasting System, Inc.*,

   35 Cal. 2d 653 (1950)........................................................................36

## RULES

FRAP § 4(a)(4)(A) ........................................................................2

FRCP § 30(b)(6)........................................................................48

FRCP § 59(e) ........................................................................ 2, 49

FRCP § 60(b) ........................................................................ 2, 49

C.D. Cal R. 7-18........................................................................ 2, 49

**STATUTES**

28 U.S.C. § 1295(a)(1)................................................................1

28 U.S.C. § 1338(a) ...................................................................1

28 U.S.C. §1331 ........................................................................1

35 U.S.C. § 271(a) ...................................................................29

Cal. Civ. Code § 954................................................................17

Cal. Civ. Code §1458 ..............................................................17

**TREATISES**

RESTATEMENT (SECOND) OF CONTRACTS § 317 (1981) ............................17

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Federal Circuit Rule 47.5, Appellant provides as follows:

(a)     There have been no previous appeals in this case.

(b)     Appellant is aware of no other case that will be directly affected by the

Court's decision in this case.

# JURISDICTIONAL STATEMENT

The basis for the District Court's subject matter jurisdiction is that Plaintiff-Appellant, Arnett Facial Reconstruction Courses, Inc. ("AFRC") alleged that Defendant-Appellee, Patterson Dental Supply, Inc. ("Patterson" or "DIS") infringed AFRC's patents. 28 U.S.C. §§ 1331, 1338(a). The Court of Appeals for the Federal Circuit has jurisdiction to review the Order Granting Patterson's Motion for Summary Judgment and the Order denying AFRC's Motion for Reconsideration based on the final judgment rule. *See, e.g.*, 28 U.S.C. § 1295(a)(1) (granting this court jurisdiction over any "appeal from a final decision of a district court of the United States … in any civil action arising under … any Act of Congress relating to patents"). The judgment appealed from is final because it was a grant of summary judgment in favor of defendant on all claims, followed by a denial of a subsequent motion for reconsideration as to the Order granting summary judgment. *Playtex Products, Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 905 (Fed. Cir. 2005). This Court also has jurisdiction to review the Order Denying AFRC's motion for reconsideration. If a motion for reconsideration has tolled the timing requirements for an appealable order, and an appeal is timely noted following the denial of the motion for reconsideration, both the appealable order and the Motion for Reconsideration may be reviewed. *Perry v. Sera*, 623 A.2d 1210, 1215, n.10 (D.C. Cir. 1993).

This appeal was timely filed.  The order granting summary judgment was entered on August 10, 2012. Judgment was entered in favor of Patterson on September 5, 2012.  AFRC timely filed its Motion for Reconsideration pursuant to FRCP 59(e), 60(b), and L.R. 7-18 on September 7, 2012, well within twenty-eight days of entry of the order and within two days of entry of judgment.   The time to file an appeal commenced from the entry of order disposing of AFRC's Motion for Reconsideration.   FRAP 4(a)(4)(A).   The Order denying AFRC's Motion for Reconsideration was entered on April 8, 2013.  AFRC timely filed its Notice of Appeal on April 12, 2013.

## STATEMENT OF THE ISSUES

1.     Did the District Court err in holding that an agreement between Dr. William Arnett and Dolphin Imaging Systems, LLC, which purportedly gave Dolphin the right to use unpatented methodologies, gives Patterson the right to practice the patents-in-suit?

2.     Did the District Court err in holding that AFRC's patent infringement claim against Patterson is barred by equitable estoppel even though there is insufficient evidence in the record to meet the requisite elements for equitable estoppel?

3.    Did the District Court err in making an implicit ruling on a Phase II issue – whether Patterson's software infringes on AFRC's patents – when it granted judgment in favor of Patterson even though Phase II discovery hadn't yet taken place?

4.    Did the District Court err in denying AFRC's Motion for Reconsideration as to the District Court's order granting summary judgment in favor of Patterson when, after the hearing on Patterson's Motion for Summary Judgment, AFRC uncovered Phase II evidence that Patterson knew its software utilized AFRC's patents?

## STATEMENT OF THE CASE

In this patent infringement case, the District Court granted summary judgment to Patterson on the grounds that a license to use unpatented "methodologies" constitutes a complete defense to a claim of patent infringement. The license at issue involved parties other than those in the present appeal and did not include terms authorizing its assignment. AFRC, the sole owner of the patents-in-suit, seeks reversal of the judgment on the following grounds: (1) AFRC has never granted Patterson a license to practice the patents-in-suit; (2) Patterson has admitted to making, using, selling and offering to sell software incorporating AFRC's patents; and (3) as a matter of law, any license to practice the patents that

3

may have been granted to Dolphin by AFRC is not transferable to Patterson without AFRC's consent.

AFRC is the holder of the patents-in-suit, Patent No. 5,951,498 ("'498") and Patent No. 6,200,278 ("'278") (collectively, the "Patents"). AFRC is owned by Dr. William Arnett ("Dr. Arnett"). In 2001, Dr. Arnett entered into an agreement with Dolphin Imaging Systems, LLC ("Dolphin") to develop and sell software. Dr. Arnett and Dolphin worked together developing and selling the software for eight years. In 2008, without the knowledge or consent of Dr. Arnett, Patterson "acquired" Dolphin, and began selling the software. Patterson never acquired a license from AFRC to practice AFRC's Patents – and, federal law clearly prohibits the transfer of a patent license without the consent of the patent holder. Consequently, on or about August 23, 2011, AFRC filed a Complaint in the Central District of California, alleging that Patterson had infringed AFRC's Patents.

The parties stipulated, and the District Court ordered, that discovery be divided into two phases. The first phase ("Phase I") dealt exclusively with the agreement(s) between Dr. Arnett and Dolphin, Patterson's acquisition of Dolphin, and damages; the second phase ("Phase II") was saved for all other issues, including issues related to infringement. In effect, Phase I focused on whether Patterson was *authorized* by agreement to practice AFRC's Patents, and Phase II focused on whether Patterson's software infringed AFRC's Patents. The District

Court disposed of the case after Phase I.

On March 15, 2012, Patterson filed a Motion for Summary Judgment, which was set for hearing on May 8, 2012.   AFRC opposed the motion.   Patterson, knowing that it could not take the position that Arnett and Dolphin had entered into a patent license (since patent licenses are not transferable without consent of the patent holder), but still having to find some basis for practicing AFRC's Patents, took the position that the "methodologies" disclosed in the Patents existed as independent "property rights" – separate and apart from the Patents themselves; and, that Patterson obtained these non-patent-based property rights from Dolphin, which in turn provided Patterson with a complete defense to patent infringement. Thus, according to Patterson, Dolphin was not granted a patent license, (which would not be transferable) but rather, a right to practice the methodologies disclosed in the Patents (which would be transferable).

Patterson's Motion was heard on May 8, 2012. Following the hearing, the District Court took the matter under submission.  On August 10, 2012, the District Court issued its ruling, adopting Patterson's position that the methodologies disclosed in AFRC's Patents are legally distinct property rights, separate from the Patents themselves. In that August 10 Order, the District Court also found that AFRC is equitably estopped from pursuing its patent infringement claim, despite a clear lack of evidence and/or disputed issues of material fact to support each of the

required equitable estoppel elements. Most critically, the District Court granted summary judgment, disposing of the entire action, by making an implicit finding on a Phase II issue, namely, that Patterson's software did not infringe AFRC's Patents. This issue was not contemplated or addressed in the summary judgment briefing by either of the parties. By finding that Patterson had a right to practice methodologies, which were separate and apart from AFRC's Patents, the District Court found that Patterson did not need (and presumably did not have) a right to practice AFRC's Patents. Thus, a Phase II issue still remained – that issue being whether Patterson's software infringed on AFRC's Patents. But, in granting summary judgment for Patterson, the District Court implicitly found that the software did not utilize AFRC's Patents and therefore did not infringe AFRC's Patents.

After the May 8, 2012, hearing on Patterson's Motion, third party Merchant & Gould was ordered to produce a contract between Dolphin and 3-M Unitek, which AFRC had requested months earlier and Patterson attempted to prevent AFRC from getting. This contract revealed that the Dolphin software (later sold by Patterson) included AFRC's Patents – not mere methodologies. Uncertain about the circumstances surrounding this contract, AFRC was finally permitted to question Dolphin and Patterson representatives about this contract on July 18 and 19, 2012, (after multiple delays by Patterson) and received the signed, final

transcripts of such depositions on August 20 and 27, 2012 (after the August 10, 2012 Order was issued).

After seeing the District Court's Order granting summary judgment for Patterson, and realizing that the District Court had completely disposed of a Phase II issue in its Order (whether the software included and infringed AFRC's Patents), AFRC, on September 7, 2012, moved the District Court for Reconsideration in light of the new evidence (contract between Dolphin and 3-M Unitek and testimony related thereto). The District Court, however, ruled that this evidence was not "newly discovered" because it was known of before the date of the order, despite ample Ninth Circuit authority indicating that evidence is "newly discovered" if discovered after the hearing. The District Court's ruling also suggested that AFRC should have anticipated that the District Court would rule on a Phase II issue and should have brought forth such evidence prior to the District Court's Order. Additionally, the District Court ruled that this evidence would not change the outcome, despite the fact that it created, at the very least, a disputed issue of fact as to whether Patterson had infringed on AFRC's Patents (which the District Court implicitly ruled it did not); and it showed that Patterson had unclean hands, having taken the position throughout the litigation that the software did not include AFRC's Patents – an issue that would affect the equitable estoppel ruling.

There are no published decisions.

## STATEMENT OF FACTS

### 1.  Arnett Assigns His Patents to AFRC.

Dr. Arnett, an oral surgeon and expert in the field of oral, maxillofacial and orthognathic surgery, developed several novel analytic treatment planning methods, for which he was granted two United States Patents, the '498 and '278 Patents. A1673:16-19; 1673:24-27; 1677-1720.   These Patents were assigned to AFRC. A1674:1-2; 1721-28.   In 2001, Dr. Arnett signed an agreement with Dolphin to develop and sell computer software products based on Dr. Arnett's methods. A1674:3-6; 1730.   Patterson contends that these methods are the same methods disclosed in the '498 and '278 Patents.   A1101:10-15; 1286:24-26 (citing A1146-49; 1163).

By way of background, Dolphin and Dr. Arnett's joint business relationship was reflected, in part, by an agreement executed by the parties (the "2001 Licensing Agreement") and amended in 2003 (the "2003 Amendment").   A1730-1735.   Dolphin and Dr. Arnett also executed a Non-Disclosure Agreement ("NDA") on January 20, 2003, relating to Dr. Arnett and AFRC's information, ideas and data relating to a computerized diagnosis and treatment planning system developed by Dr. Arnett.   A1674:11-13; 1732-33.   None of the written agreements between Dolphin and Dr. Arnett allowed for the assignment of any rights contained therein.   A1670:19-21.

8

## 2.  Patterson Acquires Dolphin with Knowledge of AFRC's Patents.

In December 2008, Patterson purportedly "acquired" Dolphin.  A1288:10-13, citing A1254. Dr. Arnett was not told about the acquisition before it closed and was not provided details concerning the acquisition until this litigation ensued. A1674:22-28. Patterson was well of aware of Dr. Arnett and his contributions to the software, as his name appears throughout the Dolphin acquisition documents, both as a brand (i.e., the "Arnett Wizard" trademark) and as an "author" of the software. The 2001 Agreement between Dr. Arnett and Dolphin was also clearly identified in the Dolphin acquisition documents. As to AFRC's Patents, Patterson was also apprised of their existence before the close of the acquisition transaction. Indeed, as recently as two weeks before the close, Chester Wang ("Wang"), CEO of Dolphin, contacted Dr. Arnett and requested a written report listing all of AFRC's Patents. Dr. Arnett promptly complied and sent Wang the list on December 4, 2008. This list contained the '498 and '278 Patents.  A1675:19-25; 1754-60.  In deposition, Mr. Wang did not deny sending the list of the Patents to Patterson and, further, stated that he would have provided Patterson with any information he thought was relevant.  A1812:1-2; 1840-42.  In addition, the Patents were a matter of public record, easily obtainable through the United States Patent and Trademark online database, at www.uspto.gov.

Thus, Patterson knew of AFRC's Patents long before it began selling the Software in December 2008 and, yet, Patterson never sought or obtained permission to do so from AFRC. A1670:1-6. Nor did Patterson request consent from AFRC (or Dr. Arnett) to the transfer of any rights Dolphin had to Patterson. A1670:1-6. AFRC likewise did not grant Patterson an express license to use the Patents, either before or after its acquisition of Dolphin. A1669:21-22.

### 3. **Patterson Infringes AFRC's Patents.**

After the acquisition of Dolphin was complete, Patterson immediately began selling the software – but did not seek or obtain permission from AFRC (or Arnett) to do so. A1669:21-22 (citing 1675:1-3, 16-18, 1676:3-4); 1670:1-6 (citing 1675:6-10, 1675:26-1676:2); 1674:17-21; 1675:13-15. Despite Dr. Arnett's request for clarification as to what effect the acquisition would have, if any, on his longstanding business relationship with Dolphin, Mr. Wang and Patterson evaded the requests. Dr. Arnett continued to be told he "would be taken care of." A1674:22-28. Patterson continued to sell the Software unfettered. In June 2010, after repeated requests from Dr. Arnett for clarification, Patterson sent AFRC a proposed patent license, requesting permission to practice AFRC's Patents for the first time. A1670:1-3. The fact that Patterson sent a proposed patent license evidences that Patterson knew a patent license was required to sell the software. AFRC did not sign Patterson's proposed patent license and never executed a

10

written patent license in favor of Patterson.  A1669:21-22; 1675:16.

On receipt of the proposed patent license from Patterson, AFRC's counsel sent Patterson and Dolphin correspondence on August 20, 2010, notifying Patterson that it *did not* have a license to use the Patents and further advising that a license would be required if Patterson intended to manufacture, use, sell, or offer to sell the software.    A1810:10-20; 1815-18.    AFRC's counsel also requested information regarding the scope of rights that Dolphin purportedly transferred to Patterson as it pertained to AFRC's rights.  Patterson ignored these requests.

When Patterson finally did respond, two months later, its general counsel cavalierly pronounced that Patterson had decided to "maintain the status quo and proceed under the existing 2001 Agreement, as amended."  A1810:21-24; 1820. As the 2001 Agreement *did not* contain a provision authorizing its assignment to a third party, there was no "status quo" to maintain with Patterson – a nonparty to the 2001 Agreement.  A1670:19-21.  AFRC's counsel also expressly demanded that Patterson confirm in writing that it would not sell any software based on the Patents unless and until it obtained an appropriate license from AFRC.  A1810:25-1811:4; 1822-23.  Patterson did not respond.  A1810:25-1811:4.  After litigation commenced, and despite the repeated demands that Patterson refrain from selling software based on the Patents until a license was secured, Patterson's counsel nevertheless asked AFRC's counsel if AFRC wanted Patterson to stop selling the

11

"Arnett/Gunson FAB Analyses module." A1811:5-11; 1825. AFRC's counsel responded by noting that such a request presupposed that Patterson already had a right to sell the "Arnett/Gunson module" in the first place, and requested proof as to what that presupposition was based upon. A1811:12-22. Patterson, again, did not respond. A1811:12-22.

### 4. Procedural History and the Court's Orders.

#### a. *The Discovery Was Divided Into Two Phases.*

As noted, the discovery in this action was divided into two phases. Phase I was to include discovery "limited to historical issues and damages issues: the 2001 Agreement and 2003 Amendment and other understandings and communications between and during the life of the Dolphin relationship with Arnett; the terms of [PDS's] acquisition of [Dolphin]; and [PDS's] sales of the Arnett module after it acquired Dolphin." A3:19-28; 837-38. Phase II, if necessary, was to include "discovery and other litigation proceedings on any remaining issues" that are directly related to the two Patents. *Id.*

#### b. *The District Court Grants Patterson's Motion for Summary Judgment.*

On March 15, 2012, before Phase II discovery had commenced, Defendants moved for summary judgment on Plaintiffs' Complaint. Despite having incomplete evidence, and with discovery ongoing, the District Court granted

12

summary judgment in Patterson's favor, issuing an Order granting the Motion on August 10, 2012. The Order was reduced to a judgment on September 5, 2012. A1-16.

Specifically, the District Court's Order made the following findings of fact:

1. G. William Arnett ("Arnett"), a surgeon, developed innovative "methodologies" of analyzing and planning orthognathic surgery, i.e., surgery of the face, especially the jaws and soft tissue, to promote facial balance. [A52:18-53:23].

2. On October 15, 1997, Arnett executed an assignment document conveying his entire right, title, and interest in the invention of the provisional patent application to Plaintiff Arnett Facial Reconstruction Courses, Inc. ("AFRC"). [A1195-201; 1150:3-7, 12-15, 20-23; 1151:2, 5-10; 1152:17-19].

3. On October 16, 1997, Arnett filed a provisional patent application, Application No. 60/062,433, entitled "Method of Cephalometrics Analysis," with the United States Patent and Trademark Office ("USPTO"). [A67-86 (United States Patent No. 5,951,498), at 1; 88-107 (United States Patent No. 6,278,200), at 1].

4. On August 3, 1998, Arnett filed a patent application, Application No.09/128,378, based upon the provisional patent application with the USPTO. A patent on Application No. 09/128,378, United States Patent No. 5,951,498, entitled "Soft tissue cephalometric analysis for diagnosis and cephalometric treatment planning of facial imbalance," ("the '498 Patent"), was issued on September 14, 1999. ['498 Patent, A67].

5. On September 14, 1999, Arnett filed Application No. 09/394,735, with the USPTO. A patent on Application No. 09/394,735, United States Patent No.6,200,278 ("the '278 patent"), entitled "Gender specific soft tissue cephalometric analysis for diagnosis and cephalometric treatment planning of facial imbalance," was issued on March 13, 2001. [A88; 1673:16-19; 1678-99].

6. The '498 patent and the '278 patent are the patents-in-suit. [A57:17-63:13].

7. On March 26, 1998, Arnett recorded the October 15, 1997 assignment with the USPTO. [A1195-1201; 1150:3-7, 12-15, 20-23; 1151:2, 5-10; 1152:17-19].

8. On November 21, 2000, Arnett executed an assignment document conveying his entire right, title, and interest in the invention of Application No. 09/394,735 to AFRC. [*Id.*]

9. On February 21, 2001, Arnett recorded the November 21, 2000 assignment with the USPTO. [*Id.*]

10. AFRC is wholly owned and controlled by Arnett and has been since it was formed. [A1142:16-1143:2; 1143:9-14, 21-23].

11. As of January 2001, Dolphin Imaging Systems, LLC ("Dolphin") was in the business of providing imaging, diagnostic, and case presentation software for dental specialty professionals. [A51:9-18].

12. Arnett and Dolphin entered into an agreement dated January 31, 2001 (the "2001 Agreement"). [A1206-20; 1144:8-10; 1145:9-12].

13. Negotiation of the terms of the 2001 Agreement occurred exclusively between Arnett and Chester Wang, Dolphin's chief executive officer. [A1160:23-1161:12; 1161:14-24].

14. The methodologies described in the 2001 Agreement are some of the methodologies covered by the '498 Patent and the '278 patent. [A1146:11-12; 1146:20-1147:4; 1148:2-7, 12-25; 1149:11-16; 1163:17-20; 1845:15-21].

15. The 2001 Agreement does not use the word "patent." [A1163:17-20].

16. Arnett did not understand the 2001 Agreement to confer any exclusive rights on Dolphin. [*See* Feb.24, 2003 Letter from P. Slaughter to C. Wang, A1217-19 (offering exclusive rights);

14

A1169:16-1173:10 (testifying that he is unable to identify any inaccuracies in the letter)].

17. Neither Arnett nor AFRC caused the 2001 Agreement to be recorded with the USPTO. [A1287:14-15].

18. The 2001 Agreement was amended on August 6, 2003 (the "2003 Amendment"). [A1193-94; 1169:16-1173:10; 1174:13-15; 1174:17-1175:13; 1175:16-25; 1176:12-18, 1176:20-1177:2; 1180:13-21, 1181:7-14; 1182:3].

19. Neither Arnett nor AFRC caused the 2003 Amendment to be recorded with the USPTO. [A1288:8-9].

20. In December 2008, Defendant Patterson Dental Supply, Inc. acquired all of the membership interests and rights in Dolphin. [A51:24-27; 1254:25-28]. PDS now conducts the business operations formerly conducted by Dolphin. [*Id*.]

21. PDS has succeeded to Dolphin's position as a party to the 2001 Agreement, as amended by the 2003 Amendment. [A1405:6-8 ("Arnett performed each and every covenant and condition of his agreements with Dolphin and its successor Patterson…."); 1404:22-27 ("Implied in the written 2001 Licensing Agreement and 2003 Amendment between Arnett and Dolphin, and its successor Patterson, is a covenant of good faith and fair dealing…."); 1405:1-5 ("[b]y Dolphin and its successor"); 1254:24-27 ("In December 2008, PDS acquired all of the membership interests and rights in Dolphin, and succeeded to Dolphin's rights under the 2001 Agreement, as amended. I had primary responsibility for negotiating the acquisition on behalf of Dolphin. PDS now conducts the business operations formerly conducted by DIS.").]

22. Arnett had accepted payments from PDS under the 2001 Agreement, as amended. Arnett accepted $85,613.20 in payments from PDS after it acquired Dolphin in 2008, between May 14, 2002 and November 4, 2011. (A1254:22-23; 1255:1-2; 1257-82; A1178:12-13, 15-16, 1179:3-9, 14-19.)

23. AFRC is the owner of both patents-in-suit, having been assigned the patents-in-suit by Arnett. [A1673:13-1674:6].

24. At all times relevant to the Complaint, AFRC has been the exclusive holder of all right, title, and interest in the '498 patent and the '278 patent. [A57:19-26; 60:19-27].

25. The 2001 Agreement and 2003 Amendment are governed by California law. [A54:14-55; 1408-10]

Based on these Findings of Fact, the District Court made the following conclusions of law:

1. Arnett conveyed PDS a warranted, potentially perpetual, and fully assignable right — embodied in the 2001 Agreement, as amended by the 2003 Amendment to that agreement — to practice the methodologies that correspond to those of the two patents-in-suit, the '498 patent and the '278 patent. [A1193-94].

2. Arnett, who owns and controls AFRC, conveyed to Dolphin in the 2001 Agreement, as amended, the right to use the methodologies separate and apart from any patent rights Arnett or AFRC may hold. *See, e.g.*, *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 262-63, 266 (1979) (holding agreement to pay royalties for an idea, for which the patent application was rejected, enforceable under state contract law); *Jacobs v. Nintendo of America, Inc.,* 370 F.3d 1097, 1101 (Fed. Cir. 2004) (affirming summary judgment for the defendant on patent infringement claim where an agreement entered into by the plaintiff granted the right to make and sell devices that incorporated the patented property); *Standard Sewing Mach. Co. v. Jones*, 260 F. 170, 175-176 (3d Cir. 1919) (holding damages are limited to those arising from breach of contract, not from infringement, where the contract granted the right to sell a patented sewing machine).

3. The terms of the 2001 Agreement, as amended, speaks of methodologies, not patents. One of the patents-in-suit, the '278 patent, had not yet issued when the 2001 Agreement was signed. ['278 patent, A88].

16

4. The 2001 Agreement has no fixed duration, and specifically has no duration of any patent right. See *Aronson*, 440 U.S. at 264-65.

5. The 2001 Agreement provided that it was governed by California law, rather than federal law. [A1193 ("11. Governing Law. This agreement shall be governed in all respect by the laws of the State of California."); 1144:8-10, 16-18].

6. The 2001 Agreement was not recorded with the United States Patent and Trademark Office. [*Id*.]

7. PDS succeeded to Dolphin's rights under the 2001 Agreement, as amended, by virtue of: (1) PDS's acquisition of Dolphin in late 2008 [A51:24-52:2; 1254:24-27]; (2) Arnett's acceptance of monies under the 2001 Agreement, as amended, from Dolphin before the acquisition and from PDS after the acquisition [A1254:22-23; 1255:1-2; 1257-82; 1178:12-13, 15-16; 1179:3-9, 14-19], and (3) Arnett's and AFRC's admissions that PDS has succeeded Dolphin as a party to the 2001 Agreement, as amended. [A1202-05 ("the 2001 Agreement and 2003 Amendment utilize gross receipts as the basis of calculating royalties due our clients")].

8. PDS owns the Dolphin software it acquired in connection with its acquisition of the membership rights and interests in Dolphin. PDS similarly has the right to distribute and sell the software. PDS has the right to make, use, sell, and offer for sale the software because Arnett sold Dolphin the right to use his methodologies in the software. [*Id*.]

9. AFRC has no cause of action against PDS for making, using, selling, or offering to sell the software. *See, e.g.*, CAL. CIV. CODE § 954 (West, Westlaw through 2012 Sess.) ("A thing in action arising . . . out of an obligation, may be transferred by the owner); CAL. CIV. CODE §1458 (West, Westlaw through 2012 Sexx.) (providing that contractual rights are generally assignable); RESTATEMENT (SECOND) OF CONTRACTS § 317 (1981) (stating that contractual rights are generally assignable); *see also, e.g., Jacobs*, 370 F.3d at 1101 ("[A] party may not assign a right, receive consideration for it, and then take steps that would render the right commercially worthless."); *Galbraith v. Resurgent Capital Servs.*, No.

CIV S 05- 2133 KJM, 2006 WL 2990163, at *1-2 (E.D. Cal. Oct. 19, 2006) (Mueller, Mag.) (equitable estoppel permits a successor of a party to an agreement to invoke the agreement's arbitration clause when it is sued for the violation of a right under the agreement) (citing *Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006)).

10. PDS may invoke an equitable estoppel defense against AFRC. See Findings of Fact No. 22; "[T]he elements of an equitable estoppel defense . . . include: (1) communication or action by the patentee indicating that the alleged infringer will not be disturbed in his activities; (2) reliance by the alleged infringer on the patentee's conduct; [and] (3) material prejudice by the alleged infringer if the patentee is allowed to proceed (citation omitted)." *Raber v. Pittway Corp.*, 1994 WL 374542, at *5 (N.D. Cal. July 11, 1994) (Smith, J.); *see also Windbond Elecs. Corp. v. Int'l Trade Comm'n,* 262 F.3d 1363, 1374 (Fed. Cir. 2001) ("[a]n implied license may arise by equitable estoppel, acquiescence, conduct, or legal estoppel"). An estoppel defense may be invoked by a corporate successor based on conduct directed to its predecessor entity. *Jamesbury Corp v. Litton Indus. Prods., Inc.*, 839 F.2d 1544, 1555 (Fed. Cir. 1988) (successor-in-interest to original infringer entitled to rely on lack of communication to predecessor-in-interest from patentee for purposes of demonstrating reliance), *overruled on other grounds by A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1042 (Fed. Cir. 1992). "To demonstrate reliance, the infringer must show a relationship with the patentee which lulled the infringer into a sense of security in continuing his activity." *Raber*, 1994 WL 374542, at *5.

### c.  *AFRC Discovered New Evidence Relevant To The District Court's Ruling on Summary Judgment, But AFRC's Reconsideration Motion is Denied.*

On September 7, 2012, AFRC moved the Court for reconsideration of its Order and Judgment on the grounds that new evidence was uncovered after the hearing on the Motion for Summary Judgment.  A2396-419.

18

### d.    *Patterson's Position Throughout Litigation Was That The 2001 Agreement was Not a Patent License.*

Relevant to the present appeal, from the beginning of the litigation, Patterson has denied that the 2001 Agreement was a patent license (something the District Court adopted).  At a June 28, 2011 hearing, Patterson's counsel stated:

> Your Honor, this – this is a critical point today. Plaintiffs' counsel spent a lot of time characterizing the 2001 agreement, as modified by the 2003 amendment, as a patent license agreement. The Court will search the 2001 agreement in vain for any reference to a patent. That isn't what was transferred in that agreement. What was transferred in the agreement was the idea the methodology. . . .[*T*]*he 2001 agreement doesn't manifest the licensing of a patent*. (emphasis added).
>
> A2456:16-2457:5.

Later, in a hearing before the District Court on October 18, 2011, Patterson's counsel added:

> The notion that [the 2001 Agreement] amounts to a patent license that can't be assigned – as I said the last time we were together, *is a sham*. . . .[T]he Plaintiff didn't even bother to mention these patents when it was making the deal with Dolphin.  Made a written agreement in 2001 that embodied the methodologies, *but not the patents*, and now wants to sue for infringing those patents that were never mentioned. (emphasi added)
>
> A2460:10-12, 2462:19-23.

### e.    *AFRC Was Diligent in Discovering Evidence Despite Patterson's Attempts to Suppress The Evidence.*

At the Scheduling Conference before the District Court on January 4, 2012,

19

AFRC's counsel made clear that, as part of Patterson's initial disclosures, AFRC expected to receive copies of all acquisition documents, including, but not limited to, the purchase agreement between Patterson and Dolphin.  A2466:4-2469:14. Thereafter, on January 11, 2012, Patterson served its initial disclosures, but did not include the purchase agreement.  A2472:14-18, 2516-23. Patterson refused to produce the purchase agreement until the District Court signed a Protective Order. On January 30, 2012, after the Protective Order was signed, AFRC's counsel emailed Patterson's counsel again requesting the purchase agreement, stating:

> now that the Protective Order has been signed … I trust you have also sent me the disclosures your clients withheld pending the signing of the Protective Order. I particularly need to see the Dolphin/Patterson acquisition documents and all the sales-related information. A2472:19-24, 2525-26.

Then, on February 1, 2012, AFRC finally received the acquisition documents that Patterson had withheld. A2472:25-28, 2528. AFRC's counsel reviewed the documents, and buried within the 632-page purchase agreement, produced as part of several thousand pages of documents, was reference to the law firm of Merchant & Gould.  A2473:1-13. It was determined that Merchant & Gould was hired by Patterson to handle an intellectual property review prior to the close of Patterson's acquisition of Dolphin. It was thus anticipated that Merchant & Gould would have documents relating to any patents involved in the transaction, including AFRC's Patents.

Within just three (3) business days of finding the reference to Merchant & Gould, on February 6, 2012, AFRC issued a Subpoena to Produce Documents, Information, or Objects ("Subpoena") on Merchant & Gould.  A2473:1-13, 2530-38. The Subpoena sought documents that Merchant & Gould relied upon in conducting the intellectual property review regarding Patterson's acquisition of Dolphin. The Subpoena compliance date was February 17, 2012, which AFRC extended at the request of Merchant & Gould to February 24, 2012 (well before the March 15, 2012 date by which dispositive motions were to be filed).  A2473:1-13.

Despite AFRC's good faith extension, on February 23, 2012, Patterson filed a motion to quash the Merchant & Gould Subpoena in the District of Columbia. A2473:1-13.  Patterson did so to delay AFRC from obtaining key documents from Merchant & Gould – now shown to be fatal to Patterson's defense. On May 21, 2012, after the parties fully briefed the issue, the District Court in the District of Columbia granted in part and denied in part Patterson's motion to quash.  A2427-39.  In its Order, the Court modified the Subpoena and ordered Merchant & Gould to comply with the modified Subpoena on or before May 29, 2012.  A2438.  On May 29, 2012, Merchant & Gould's counsel requested from AFRC an extension of time to comply, representing that there were large volumes of documents being reviewed for production.  A2473:14-22.  AFRC's counsel demanded that the production date remain, but agreed to allow the production to proceed on a "rolling

basis," with documents to be produced daily and the final production being delivered on or before June 8, 2012. A2473:14-22. On May 29, 2012 (after the hearing on the parties' summary judgment motions), Merchant & Gould produced a single 15-page document, Bates numbered MG000001-MG000015. A2473:14-22, 2476-90, 2540-41. This document was a contract between Dolphin and 3-M Unitek, executed on or about September 11, 2001. Executed by Mr. Wang on behalf of Dolphin, this contract contained a provision making clear that Dolphin's software utilized AFRC's Patents.

Despite the fact that AFRC timely noticed Defendant's 30(b)(6) deposition for February 28, 2012, Patterson refused to appear. After continual delays, Patterson finally agreed to produce its 30(b)(6) designees on July 18 and 19, 2012. Patterson designated Mr. Wang as its designee for several topics and Richard Gluesenkamp ("Gluesenkamp") for others. During his deposition, Mr. Wang was asked several questions about the Dolphin 3-M Unitek contract's reference to AFRC's Patents, and each time he clearly stated that the Patents were knowingly included in Dolphin's software. A2508:7-14; 2510:7-16, 2511:20–2512:5; 2513:18-23.

On August 20, 2012, AFRC received from Patterson the executed and corrected deposition transcript for Mr. Gluesenkamp's deposition. A2474:5-9, 2492-96. And, on August 27, 2012, AFRC received from Patterson the executed

and corrected transcript for Mr. Wang's deposition. A2474:10-14, 2498-2505.

### f.    The District Court Denied AFRC's Motion for Reconsideration.

Based on the facts stated above, the District Court denied AFRC's Motion for Reconsideration.    A16-26.    *First*, the District Court determined that the evidence was not "newly discovered" because AFRC was given access to the 3-M Unitek Contract and had deposed Patterson's 30(b)(6) designees prior to the District Court's August 10 Order.  *Second*, the District Court held that AFRC could have brought to the Court's attention the substance of the 30(b)(6) depositions. *Third*, the District Court held that this evidence was cumulative of AFRC's other evidence offered in support of its Opposition to Patterson's Motion for Summary Judgment.  And *fourth*, the District Court ruled that the proffered evidence further supported the District Court's ruling on equitable estoppel in its August 10 Order. A16:26.

Following the District Court's ruling on the Motion for Reconsideration, this appeal timely followed.

## SUMMARY OF THE ARGUMENT

**The District Court erred in granting summary judgment in favor of Patterson; Patterson was never granted a license to practice the Patents**.  As a matter of federal law, a patent license cannot be assigned without the patent

owner's consent. *Unarco Industries, Inc. v. Kelley Co.*, 465 F.2d 1303, 1306 (7th Cir. 1972). Thus, the issue on Patterson's Motion for Summary Judgment was whether the 2001 Agreement between Dr. Arnett and Dolphin, that was allegedly assigned to Patterson, was a patent license. In its Order, the District Court concluded that the 2001 Agreement conveyed to Dolphin "the right to use the methodologies *separate and apart from any patent rights* Arnett or AFRC may hold. A6:25-7:2, 7:10-13, 9:1-13 (emphasis added). This is a confounding legal concept, one which blurs the lines between patents and state law-based rights, such as trade secrets. Typically, when one confers upon another the right to use the methodologies that are disclosed in a patent, a patent license is created. *Intel Corp. v. Broadcom Corp.*, 173 F. Supp. 2d 201, 228 (D. Del. 2001). Those methodologies, having been disclosed to the public in the patent, can no longer be considered trade secrets – they are no longer "not generally known." *Bonito Boats v. Thunder Craft Boats*, 489 U.S. 141, 149, 151 (1989). So, a license to practice the patent is required to use the methodologies disclosed in the patent. Here, however, the District Court created a new right – one which contains all of the benefits of a patent license, but with the added benefit of being "perpetual." A1193-94. Indeed, the right fashioned by the District Court was found to be "potentially perpetual." *Id*. Obviously, once a patent issues on a method, the patent owner cannot grant a "potentially perpetual" right to practice the patented method,

24

because he or she does not have such a right. *Haglund v. Dow Chemical Co.*, 1982 U.S. Dist. LEXIS 10109, *43 (E.D. Cal. Apr. 7, 1982); *Bonito Boats v. Thunder Craft Boats*, 489 U.S. 141, 149, 151 (1989). But, assuming, *arguendo*, that a right to a methodology did exist "separate and apart" from AFRC's Patent rights, then pursuant to the Court's Order, Dr. Arnett only gave Dolphin the right to practice that methodology, not AFRC's Patents. Indeed, patent rights and state-based rights are distinct rights. *State Contracting & Eng'g Corp. v. Florida*, 258 F.3d 1329, 1339-40 (Fed. Cir. 2001); *Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336, 1345-46 (Fed. Cir. 2001). Thus, the implicit ruling that the software does not infringe on the Patents, and dismissal of the entire action, was premature.

**The District Court erred in denying AFRC's Motion for Reconsideration; the Phase II evidence revealed that AFRC's Patents were included in Patterson's software.** The District Court held that AFRC's evidence regarding whether Dolphin and/or Patterson had knowledge that the software incorporated AFRC's Patents was not newly discovered evidence, since AFRC had access to such evidence prior to the District Court's August 10 Order. Ample Ninth Circuit authority, however, indicates that evidence is "newly discovered" so long as it was discovered *after* the hearing, and here, the Dolphin 3-M Unitek Contract was only discovered nearly a month after the hearing. *E.g. Frederick S. Wyle P.C. v. Texaco, Inc.*, 764 F.2d 604, 609 (9th Cir. 1985). But, even if the

25

standard was that evidence is not "newly discovered" unless it is discovered after an order issues, here, AFRC did not obtain signed, final copies of deposition transcripts authenticating the Dolphin 3-M Unitek Contract until after the August 10 Order. Most importantly, this newly discovered evidence related to Phase II issues (infringement), and thus, AFRC could not have anticipated that it would be relevant to a Phase I motion until it received and reviewed the District Court's Order. Moreover, the District Court held that this evidence was cumulative, but had the District Court relied on this new evidence, it would have, at the very least, raised a disputed issue of material fact as to whether Patterson was using AFRCs Patents without authorization in its software (relevant to the District Court's implicit Phase II ruling). And, this evidence also raised an unclean hands argument against Patterson.

## **ARGUMENT**

### 1. **Standard of Review.**

The standard of review of the District Court's ruling on summary judgment is de novo. "On appeal, we review a grant of summary judgment de novo in which we view all evidence, make all reasonable inferences, and resolve all factual disputes in favor of the nonmovant, reapplying the standards of review used below." *Augustine Medical, Inc. v. Progressive Dynamics, Inc.*, 194 F.3d 1367, 1370 (Fed. Cir. 1999); *TriMed, Inc. v. Stryker Corp.*, 608 F.3d 1333, 1339 (Fed.

Cir. 2010).

The standard of review of the District Court's Order Denying AFRC's Motion for Reconsideration is governed by the regional circuit. *Board of Trustees of Bay Medical Center v. Humana Military Healthcare Services, Inc.*, 447 F.3d 1370, 1374 (Fed. Cir. 2006). The Ninth Circuit reviews a ruling on a motion for reconsideration under an abuse of discretion standard. *Serrano v. Telular Corp.*, 111 F.3d 1578, 1584 (Fed. Cir. 1997); S*chool Dist. No. 1J, Multnomah, Or. v. ACandS, Inc.*, 5 F.3d 1255, 1262 (1993); *Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1442 (9th Cir. 1991).

2. **Legal Argument**

    a. ***Patterson's Summary Judgment Motion Should Have Been Denied.***

        1. **Patterson Was Never Granted a Right to Practice the Patents-in-Suit.**

            i. ***The Arnett and Dolphin Agreement is a Patent License.***

The District Court's Order conflicts with longstanding patent jurisprudence, essentially finding that the same "methodologies" could simultaneously be protected as patented inventions and state-based trade secrets. In its Order, the District Court held that Dr. Arnett (not AFRC) conveyed to Dolphin (not Patterson) "the right to use the methodologies separate and apart from any patent rights Arnett or AFRC may hold." A1101:10-17. On its face, this conclusion does not establish Patterson's right to practice the patents-in-suit. Nor does it establish

27

that AFRC, the owner of the patents-in-suit, granted Patterson any rights to practice the Patents. It is undisputed that AFRC is owner of the patents-in-suit. A8:14-16. Arnett, individually (not AFRC) and Dolphin entered into the 2001 Agreement. A6:12-21. The methodologies described in the 2001 agreement include methodologies covered by the '498 Patent and the '278 Patent – Patents owned by AFRC. A6:25-7:2.

From this, the District Court concluded: (a) that Dr. Arnett conveyed to Patterson a warranted, potentially perpetual, and fully assignable right – embodied in the 2001 Agreement, as amended by the 2003 Amendment to that agreement – to practice the methodologies *that correspond* to those of the two patents-in-suit, the '498 patent and the '278 patent (A8:23-27 (emphasis added)); (b) that "Arnett, who owns and controls AFRC, conveyed to Dolphin in the 2001 Agreement, as amended, the right to use the methodologies *separate and apart from any patent rights* Arnett or AFRC may hold" (A9:1-12 (emphasis added)); (c) that the terms of the 2001 Agreement, as amended, speaks (*sic*) of methodologies, not patents (A9:13-15); and, (d) that Patterson succeeded to Dolphin's rights under the 2001 Agreement, as amended, by virtue of: (1) Patterson's acquisition of Dolphin in late 2008, (2) Arnett's acceptance of monies under the 2001 Agreement, as amended, from Dolphin before the acquisition and from Patterson after the acquisition, and (3) Arnett's and AFRC's admissions that Patterson had succeeded Dolphin as a

28

party to the 2001 Agreement, as amended.  A10:12-24.

From a purely technical standpoint, AFRC and Patterson were never parties to the same agreement, including any agreement expressly permitting Patterson to make, use, sell, or offer to sell any methodologies and/or patented inventions in the software.  Dr. Arnett entered into the 2001 Agreement with Dolphin in his own name; and AFRC is the holder of the Patents.  But regardless, to practice a "methodology" that is the subject of a patent, i.e., the right to make, use, sell, or offer to sell that methodology, requires a *patent license*:

> The patent law defines infringement as making, using, or selling any patented invention without authority of the patent owner. 35 U.S.C. § 271(a). A patent therefore confers upon its owner a bundle of rights relating to the patented invention including the rights to exclude others from making, using, or selling the subject of the patent. Patent license agreements allow third party licensees to have partial or complete access to the patented invention by providing immunity from an infringement suit on the licensed patent. A patent license is essentially a waiver of the patent owner's right to sue; the parties agree that the patent owner will allow the licensee either to make, to use, to sell (or some combination of, or derivative of, these three rights) without subjecting the licensee to an infringement suit.

*Intel Corp. v. Broadcom Corp.*, 173 F. Supp. 2d 201, 228 (D. Del. 2001).

Thus, despite the characterization of the 2001 Agreement as only giving rights to practice "methodologies", those methodologies are the subject of AFRC's Patents, and thus, in order to make, use, sell or offer to sell software incorporating methodologies requires a patent license. Patterson has never been granted a patent license.

29

Rather, in its Motion for Summary Judgment, Patterson argued, and the District Court adopted, a "parallel universe" theory – where AFRC's patented methods are the same as, but legally separate from, Dr. Arnett's methodologies. The methodologies, it was claimed, were separate from the Patents and were licensed by Dr. Arnett to Dolphin, and then from Dolphin to Patterson (when Patterson acquired Dolphin).    A1101:10-20; 1115:13-1119:6. But, one cannot transfer the right to practice patented methodologies "entirely independent of the patents," as falsely suggested by Patterson, and adopted by the District Court. A1111:20-21; A9:1-3. Patterson further asserted, and the District Court adopted, that the 2001 Agreement, as amended, was not a patent license, but somehow still included "any inventive rights embodied in the patents-in-suit."  A6:25-26; A8:23-27; A1113:25; 1116:16-17.

The District Court's Order – without addressing any of the cases relied on by AFRC – bases its holding on the following cases cited by Patterson: *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 262-63, 266 (1979), *Jacobs v. Nintendo of America, Inc.*, 370 F.3d 1097, 1101 (Fed. Cir. 2004), and *Standard Sewing Mach. Co. v. Jones*, 260 F. 170 (3rd Cir. 1919).  These cases, however, are legally and factually distinguishable.

In *Jacobs*, the patent-holder plaintiff entered into a settlement agreement with a company called Analog. The settlement agreement contained two important

provisions: (1) the right not to be sued for infringement of plaintiff's patent; and (2) the right to "sell . . . micromachined accelerometers for use in tilt-sensitive control boxes." *Jacobs*, 370 F.3d at 1098-1099. Analog sold the accelerometers to its customer Nintendo, which used them in its own product. Plaintiff then sued Nintendo for patent infringement. *Id*. at 1099. The court held that Nintendo, as a customer of Analog, could not be liable for patent infringement because Analog had the right to sell Nintendo the accelerometers to its customers under the terms of the settlement agreement with plaintiff. In addition, the rights granted to Analog in the settlement agreement were much broader than a mere license, as they included the right not to be sued for infringement. *Ibid*.

Here, however, Patterson is not a retail "customer" of Dolphin, nor is it a "purchaser" of the software. Rather, Patterson acquired Dolphin and, it claimed, all of Dolphin's rights. Further, AFRC has not brought suit against Dolphin's customers for patent infringement. While Dolphin may have had the right to sell the Software to its customers, it did not have the right to transfer any patent licenses it had to Patterson, by acquisition or otherwise. It is the purported transfer of Dolphin's patent license to Patterson, not the sale of the software to customers that is at issue here. *Jacobs* is thus factually and legally distinguishable.

Moreover, *Standard Sewing* involved a contract between a patent-holder manufacturer and a sales agent who had been given the exclusive right to sell the

31

manufacturer's products in certain territories. When the sales agent sold the manufacturer's patented products outside the specified territories, the manufacturer sued for patent infringement and was awarded damages by the trial court. On appeal, the appellate court stated (in *dicta*) that the contract between the manufacturer and agent was not a patent license, but rather an agency agreement. In reversing the damages award, the court held that the damages found for infringement were not recoverable as damages for the breach of the contract of agency.

*Standard Sewing* is distinguishable from the present case in several key respects. *First*, unlike the manufacturer in *Standard Sewing*, AFRC is not a manufacturer that has merely authorized an agent to sell its finished products. Rather, Dolphin and Dr. Arnett agreed to jointly develop and sell the software. *Second*, unlike the manufacturer in *Standard Sewing*, AFRC has never entered into any agreements with Patterson – of any type. To the extent Patterson claims that it inherited the "agency" rights of Dolphin, such rights are also not transferable absent the consent of AFRC. *Bancroft v. Scribner*, 72 F. 988, 990-991 (9th Cir. 1896); *Boehm v. Spreckels*, 183 Cal. 239, 247 (1920). *Third,* the court in *Standard Sewing* did not hold that the agent was free to sell the manufacturer's products without a patent license *after* his agency agreement terminated. Rather, the question was whether such sales were permitted while the agent remained under

contract. Here, not only has Patterson never had a contract with AFRC, AFRC expressly demanded that Patterson refrain from selling the software until a license was secured. A1810:10-20; 1815-18.

*Aronson* involved an agreement between an inventor and manufacturer, whereby the latter agreed to pay royalties to the former on the sale of an unpatented keyholder. The parties contemplated two different royalty structures, one to be applied if the inventor secured a patent on the keyholder and another if he did not. The inventor ultimately failed to obtain a patent and the manufacturer sued alleging that the agreement was unenforceable. The U.S. Supreme Court held the agreement to be enforceable, even though no patent was issued. *Aronson* is distinguishable in that AFRC held two patents on the methodologies when the 2001 Agreement was signed: "Furthermore, no patent had issued, and no idea had been withdrawn from the public domain. Since no patent was involved, cases and principles relating to contracts that had patents as their subject matter were inapplicable. [P] Thus the *Aronson* case (which did not involve a patent) is inapplicable to the instant case, which does involve a patent." *In re CFLC, Inc.*, 1994 U.S. Dist. LEXIS 14382, *12 (N.D. Cal. Oct. 7, 1994). Here, the "idea" embodied in the methodologies had already been revealed to the public through the patent process when the 2001 Agreement was signed. Because the Patents already existed when that agreement was signed, federal patent law – not state contract

law—governs. *Aronson* further is not a basis for disregarding well-established federal policy against the free assignability of patent licenses:

> Applying the patent law policies identified in *Aronson* to the California law of patent license assignability reveals that a basis for preemption does exist. The policy to "foster and reward invention" is primarily accomplished by granting a 17 year monopoly for the patent holder to exploit. Limiting assignability to licenses in which the patent holder expressly agrees to assignment aids the patent holder in exploiting the patent and thus "rewards" the patent holder. Free assignability of a non-exclusive patent license without the consent of the patent holder is inconsistent with patent monopoly and thus inconsistent with the federal policy.
>
> For example, a patent holder might sell a royalty-free license to a small company which it deemed to be no threat as a competitor. If the buyer then assigned the license to a large company which is a serious competitor, the patent holder's monopolistic control would be destroyed. Appellants argue that such matters could be considered on a case by case basis. However, the federal rule instead conclusively presumes harm to monopolistic control by any assignment not expressly consented to by the patent holder, and this rule fairly carries out the policy of the patent laws. It is not for this Court to disregard that federal rule, and *Aronson* is no authority for doing so.

*Id*. at *13-14.

The 2001 Licensing Agreement purports to grant Dolphin the right to use Dr. Arnett's methodologies to jointly create the software. Whether such agreement expressly or impliedly granted Dolphin the right use AFRC's Patents may be disputable; but it is undisputed that the methods were already the subject of two federal patents – the '498 Patent, which was issued more than a year before the 2001 Agreement was executed, and the '278 Patent, which was filed prior to the

Agreement's execution. A1673:13-27; 1674:7-9. **Aronson simply does not allow whatever right Dolphin had in AFRC's Patents (if any) to be assigned to Patterson.** Urging that state law be applied to the transfer of a patent right, as Patterson does here, was error.

Further, neither AFRC nor Dr. Arnett could "sell" the methods to Dolphin independent of the Patents, because those methods were inextricably intertwined with the Patents – disclosed to the public through the federal patent process – and were not separate property rights. *Bonito Boats v. Thunder Craft Boats*, 489 U.S. 141, 151 (1989). In exchange for disclosing the method, an inventor receives a limited legal monopoly in which to exploit the idea:

> [T]he *federal patent scheme* creates a limited opportunity to obtain a *property right in an idea*. Once an inventor has decided to lift the veil of secrecy from his work, he must choose the protection of a federal patent or the dedication of his idea to the public at large. As Judge Learned Hand once put it: "[I]t is a condition upon the inventor's right to a patent that he shall not exploit his discovery competitively after it is ready for patenting; he must content himself with either secrecy or legal monopoly." *Id.* at 149, citing *Metallizing Engineering Co. v. Kenyon Bearing & Auto Parts Co.*, 153 F. 2d 516, 520 (2nd Cir. 1946), cert. denied, 328 U.S. 840 (1946) (emphasis added).

A legal monopoly is thus granted to the patent owner in exchange for his "disclosure and the consequent benefit to the community…but upon expiration of that period, the knowledge of the invention inures to the people, who are thus enabled without restriction to practice and profit by its use." *Bonito Boats*, 489 U.S. at 151.

35

Once a patent is issued on a method, then, a patent owner cannot grant a "potentially perpetual" right to practice the idea of the method, because he does not have such a right. See *Haglund v. Dow Chemical Co.*, 1982 U.S. Dist. LEXIS 10109, *43 (E.D. Cal. Apr. 7, 1982) (stating that any grant of an exclusive right to an "idea" ceases to exist upon the issuance of a patent on that idea). Whereas, patent rights and unpatented methodologies are distinct. "[T]he Supreme Court has recognized that patent rights and trade secret rights are quite distinct, and that a contract may provide for a different treatment of the two." *State Contracting & Engineering Corp. v. State of Florida*, 258 F.3d 1329, 1339 (Fed. Cir. 2001).

Furthermore, an abstract idea that is not subject to protection as intellectual property (as Patterson ostensibly claims "Arnett's methodologies" contained in the Patents are) may be the subject of a contract, but "an idea is not property subject to exclusive ownership." *Chandler v. Roach,* 156 Cal.App.2d 435, 441 (1957), citing *Stanley v. Columbia Broadcasting System, Inc.*, 35 Cal. 2d 653, 674 (1950). A contract for the right to use an idea does not "invest an abstract idea with the attributes of property and the attendant divisible assignability of those rights which constitute property ownership." *Rokos v. Peck*, 182 Cal.App.3d 604, 614 (1986). Thus, an "idea" by itself, unlike intellectual *property*, "may not be segmented into varying rights that may each be independently assigned." *Id.* at 616. *See also Id.* at 617 (finding that "an implied-in-fact contract between an author, on the one

hand, and an agent, producer, or director, on the other hand, is of such a personal nature that it is effective only between the contracting parties").

Even under state law, which Patterson contends applies over federal law, Patterson's argument that it acquired "Arnett's methodologies" free of patent restrictions, fails.

> **b.    A Patent License – such as the License Between Arnett and Dolphin to Practice the Patents-in-Suit – is Not Assignable Without Permission From the Patent Holder – AFRC.**

Because, as discussed above, the 2001 Agreement between Dolphin and Dr. Arnett was, at best, a license to practice the patents-in-suit[1], such a license could not have been transferred by Dolphin to Patterson.

The "rights" Patterson purports to have acquired from Dolphin include the right to use AFRC's patented methods.  The issue of whether Dolphin's right to practice AFRC's Patents (if it exists) is legally assignable without Plaintiff's consent is a matter of *federal law*: "the question of assignability of a patent license is a specific policy of federal patent law dealing with federal patent law." *Unarco Industries, Inc. v. Kelley Co.*, 465 F.2d 1303, 1306 (7th Cir. 1972).  Federal law is clear: patent license agreements "are personal to the licensee and not assignable

---

[1] Although the Order avoids using words suggesting that Dolphin had a *license* to practice the Patents, the granting of "the right to make, use, or vend the patented article" is, by definition, the granting of a license.  *See* "license," Ballentine's Law Dictionary, 3rd ed.

unless expressly made so in the agreement." *Ibid.* (emphasis added).  Patterson concedes this issue.  A1121:1-8.

In *SQL Solutions*, the court held that a transfer of rights occurring as a result of a legal change in ownership of a business constituted a violation of federal copyright law's "bright line prohibition against transfer of copyright license rights." *SQL Solutions v. Oracle Corp.*, 1991 U.S. Dist. LEXIS 21097, *12, 15-16 (N.D. Cal. Dec. 18, 1991) (further stating that, under California Supreme Court precedent, a transfer of rights by way of a change in the legal form of a business is only permissible if it does not "adversely impact the party benefited by the prohibition against assignment").  This finding was based on the "historic kinship between patent law and copyright law" and the recognition that "[t]he prohibition against transfer of patent licenses is longstanding and frequently invoked." *Id.* at 15 (emphasis added).  The result is the same even if the patent license is implied by law rather than embodied in a written contract.

Likewise here, any transfer of rights in AFRC's Patents that occurred as a result of Patterson's acquisition of Dolphin violated the federal bright line prohibition against transfer without the consent of the patent holder.

Thus, Patterson does not have the right to practice the patents-in-suit, nor the "methodologies" that are the subject of the patents-in-suit.

2. **There Was Insufficient Evidence in the Record Supporting the District Court's Ruling that Dolphin May Invoke an Equitable Estoppel Defense.**

The District Court made a finding of fact that "Arnett had accepted payments from [Patterson] under the 2001 Agreement, as amended.    Arnett accepted $85,613.20 in payments from PDS after it acquired Dolphin in 2008, between May 14, 2002 and November 4, 2011." A8:10-13.  Based on this sole fact, the District Court held Patterson "may invoke an equitable estoppel defense against AFRC."    The District Court made a finding that Patterson *may* establish an equitable estoppel defense, but did not make a finding that Patterson has met all of the elements to establish an equitable estoppel defense; and there is insufficient evidence in the record to support Patterson's equitable estoppel defense, especially on summary judgment.

"Equitable estoppel may be imposed in a patent case when a patentee induces another party to believe that it will not sue that party for infringement." *Illinois Tool Works, Inc. v. MOC Products Co., Inc.*, 856 F.Supp.2d 1156, 1186 (S.D. Cal. 2012), quoting *Forest Labs, Inc. v. Abbott Labs.*, 339 F.3d 1324, 1329 (Fed. Cir. 2003).  For the defense to apply, the accused infringer must establish three elements: (1) "[t]he patentee, through misleading conduct, le[d] the alleged infringer to reasonably infer that the patentee d[id] not intend to enforce its patent against the alleged infringer"; (2) "[t]he alleged infringer relie[d] on that conduct";

39

and (3) "[d]ue to its reliance, the alleged infringer will be materially prejudiced if the patentee is allowed to proceed with its claim." *Illinois Tool Works, Inc. v. MOC Products Co., Inc.*, 856 F.Supp.2d 1156, 1186 (S.D. Cal. 2012), quoting *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1041 (Fed. Cir. 1992). In *Wang Laboratories, Inc. v. Mitsubishi Electronics America, Inc.*, 103 F.3d 1571, 1581 (Fed.Cir.1997), this Circuit described "a typical equitable estoppel situation as one in which (1) the infringer knows of the patent, (2) the patentee objects to the infringer's activities, (3) but the patentee does not seek relief until much later, (4) thereby misleading the infringer to believe the patentee will not act." Similarly, in *Winbond Electronics Corporation v. International Trade Commission*, 262 F.3d 1363, 1374 (Fed. Cir. 2001), the Federal Circuit concluded "the alleged infringer must have knowledge of the patentee and its patent."

Here, the first element is not met. In order to prove the first element, the patentee must have communicated something to the infringer-in-suit in a misleading way:

> The "something" with which this case, as well as the vast majority of equitable estoppel cases in the patent field is concerned, is that *the accused infringer* will not be disturbed by the plaintiff patentee in the activities in which the former is currently engaged. The patentee's conduct must have supported an inference that the patentee did not intend to press an infringement claim *against the alleged infringer....* The alleged infringer also must know or reasonably be able to infer that the patentee has known of the former's activities for some time. *Aukerman*, 960 F.2d at 1042 (emphasis added) (citations and footnotes omitted).

Thus, in order for the first element to be satisfied, the question is whether the patentee's conduct supported a reasonable inference that the patentee did not intend to press an infringement claim against the alleged infringer. *Aadventure Products, Inc. v. Simply Smashing, Inc.*, 2007 WL 2775128, at 4 (S.D. Cal. 2007), citing *Aukerman*, 960 F.2d at 1042. "On summary judgment, such inference must be the *only possible inference* from the evidence." *Aadventure Products, Inc. v. Simply Smashing, Inc.*, 2007 WL 2775128, at 4 (S.D. Cal. 2007) (emphasis added), citing *Aukerman*, 960 F.2d at 1044.

Here, it cannot be said that there was misleading conduct on the part of Dr. Arnett/AFRC from which the *only* reasonable inference is that Arnett/AFRC did not intend to enforce the Patents against Patterson. Dr. Arnett, not AFRC (the owner of the patents-in-suit) was sent three checks from Patterson before Dr. Arnett's counsel wrote to Patterson confirming that Patterson did not have a license to use the Patents (and thereby taking an active step in representing that AFRC will enforce its patent rights). A1288:26-90:10; 1254-55, 1257-82; 1273-82; 1671:7-8; and 1815-18. Merely accepting three checks is not sufficient to amount to *misleading conduct* suggesting that AFRC will not press on an infringement claim. Moreover, it cannot be said that there is only one reasonable inference. Per the 2003 Amendment, Dr. Arnett was to receive two types of payments: (1) $800 in royalties for each module sold; and (2) 20% of gross

41

receipts of sales of software by Dolphin that takes place at a course taught solely by Dr. Arnett, and 10% of gross receipts of sales of software by Dolphin that takes place at a course taught with Dr. McLaughlin (*i.e.,* "commissions"). A1194. The check stubs that Dr. Arnett received from Dolphin provided a break-down as to what payments were for royalties, and what payments were for commissions. Unlike those checks that Arnett received from Dolphin, however, the stubs on the checks from Patterson did not indicate whether payment was for "commissions" or "royalties". The inference could have been that Dr. Arnett was accepting the checks as payment for the commissions that he had earned on sales, but not for royalties.

Moreover, under the District Court's findings, the 2001 Agreement granted only the right to use methodologies, not the Patents. Based on Patterson's own characterization of the 2001 Agreement, and the District Court's adoption of that characterization, Patterson was not paying for a patent license. It was paying solely for unpatented methodologies. *Painton & Co. v. Bourns, Inc.*, 442 F.2d 216, 224 (2d Cir. 1971) (It has been held that "[a] licensee will not pay as much for a license of unpatented know-how, even if it be exclusive, which carries no protection against the world, as for such a license of a valid patent"). And, by Dr. Arnett accepting those reduced payments for unpatented methodologies, it cannot be said that he was creating an inference that he will not sue for patent infringement.

42

Similarly, it is inconsistent for the District Court to have found that Dr. Arnett mislead Patterson into believing that AFRC did not intend to enforce its Patents against Patterson, but concurrently adopt Patterson's argument that the 2001 Agreement was not about patents, and implicitly find that the software does not infringe AFRC's Patents.

Moreover, there is a dispute about what Dolphin told Dr. Arnett about the Patterson acquisition, and what effect it would have on Dolphin and Dr. Arnett's relationship.  Dr. Arnett repeatedly asked Dolphin for clarification on what effect the acquisition would have on Dr. Arnett and Dolphin's relationship, and Dolphin, without answering, told him he would be "taken care of."  A1674:22-28.  Based on his relationship with Mr. Wang and Mr. Wang's assurances that Dr. Arnett would be "taken care of," Dr. Arnett accepted checks from Patterson.  It is undisputed, however, that once Dr. Arnett learned, by way of Patterson's proposed contract and patent license, that Patterson believed it owned all of Dr. Arnett's and AFRC's intellectual property rights, AFRC unequivocally informed Patterson that it was not to practice AFRC's Patents without a license.  A1810:10-20, 1810:25-1811:4; 1815-18; 1822-23.

Furthermore, there is a clear lack of any evidence whatsoever in the record suggesting that Patterson had relied on the fact that Dr. Arnett had accepted checks. When a triable issue of fact exists as to whether a defendant relied on conduct

43

rather than on a business judgment of its own, summary judgment as to an equitable estoppel defense should not be granted. *Aadventure Products, Inc. v. Simply Smashing, Inc.*, 2007 WL 2775128, at 4 (S.D. Cal. 2007), citing both *Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 776 (Fed. Cir. 1995) and *Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548, 1558 (Fed. Cir. 1996). Here, Patterson did not put forth, and the District Court did not rely on, any evidence of Patterson's reliance.   "[I]ndeed, the evidence shows that … [Patterson] consistently insisted that its process did not infringe [AFRC's] utility patent." *Aadventure Products, Inc. v. Simply Smashing, Inc.*, 2007 WL 2775128, at 5 (S.D. Cal. 2007). Throughout the litigation, and even as adopted by the Court, Patterson has always maintained that the software does not use the patents-in-suit, but uses methodologies that are the basis of the patent.   Such representation, and such finding, runs counter to Patterson relying on an inference that it will not be sued for patent infringement.   Moreover, "[t]here is no evidence that [Patterson] did anything differently during the time period when [AFRC] was asserting that [Patterson] was infringing the utility patent.   Therefore a triable issue as to whether [Patterson] expanded its business, relying on the fact that it would not be sued, or whether Patterson would have expanded its business anyway." *Id.* see also *Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 776 (Fed.Cir.1995) (holding that there was a triable issue as to reliance where the evidence showed

that the defendant paid little attention to the plaintiff's complaints of infringement because the defendant believed the patent was invalid).  Here, Patterson has not put forth any evidence that it would have acted differently during the time that Dr. Arnett had accepted checks written to him, or that Patterson acted differently once it received a letter from Dr. Arnett's attorney regarding the patent infringement.

### c.    The District Court Erred in Disposing of the Entire Action.

As acknowledged by the Order on Motion for Summary Judgment, the case was divided into two phases.  A3:19-27.  Patterson's Motion for Summary Judgment dealt specifically with a Phase I issue.  Patterson successfully persuaded the District Court to conclude that Dr. Arnett conveyed to Dolphin "the right to use the methodologies *separate and apart* from any patent rights Arnett or AFRC may hold."  A9:1-3.  Thus, the District Court's Order found that the 2001 Agreement gave Patterson the right to use only unpatented methodologies, but not federal patent rights.  But by dismissing the entire action, and not going to Phase II, the District Court implicitly found that Patterson's Software did not exceed the bounds of the 2001 Agreement, and thus, did not infringe AFRC's Patents.  In other words, in denying that the 2001 Agreement was a patent license, the 2001 Agreement could not have conveyed patent rights.  Patent rights and state-based rights are distinct rights.  See *State Contracting & Eng'g Corp. v. Florida*, 258 F.3d 1329, 1339-40 (Fed. Cir. 2001) (noting that patent rights and trade secret rights are

distinct rights); *Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336, 1345-46 (Fed. Cir. 2001) (holding that the transfer of copyright, know-how, and technical expertise did not confer a patent license).

Thus, any use of AFRC's Patents in Patterson's software would be unauthorized and infringing. Under the District Court's Order, Patterson only had the right to use unpatented methodologies – not the Patents. But, Phase II was the phase in which the parties were to ascertain whether the software improperly used AFRC's patents. And as will be discussed in the Motion for Reconsideration section of this Brief – the software did improperly use AFRC's Patents.

### d. *The District Court Erred in Sustaining Patterson's Objections.*

The District Court erred in sustaining the following evidence from Dr. Arnett's Declaration:

- Paragraph 14: However, at no time, did I ever agree or consent to Dolphin transferring any rights to Patterson, including rights Dolphin may have had to use AFRC's patents.

- Paragraph 16: Neither I nor AFRC has ever granted Patterson any right to make, use, sell, or offer to sell AFRC's patents. In addition, neither I nor AFRC has ever signed an agreement with Patterson relating to the AFRC's patents.

46

- Paragraph 20: I have never executed, either in my individual capacity or on behalf of AFRC, any written license to Patterson with regard to the '498 patent and the '278 patent.

- Paragraph 23: The first time Patterson ever presented me with a proposed license concerning the '498 patent or the '278 patent was in June of 2010, when I received a proposed Non-Exclusive Patent License Agreement, attached to the Joint Development & Marketing Agreement.

A2354:5-28, 2356:16-2359:23; see also A1674:17-21, 1675:1-3, 13-15, 1675:26-1676:2.

Patterson had objected to the aforementioned evidence as improper legal conclusions, that Arnett doesn't have personal knowledge as to the legal significance of his actions, and that the statements are argumentative. The District Court, without any analysis and without any indication as to which specific objections it was basing its decision on, sustained Patterson's objections as to each of the aforementioned paragraphs. But how else is a lay witness supposed to indicate that he or she did not sign or execute any agreement? Or how else is a witness supposed to indicate when they first received a proposed license? One of the key issues is whether Arnett and/or AFRC gave any written consent to Patterson to practice AFRC's Patents here, Arnett declares that neither he nor

47

AFRC did give such consent in writing. Taking the reverse as true, any time an individual declares that they did execute or enter into a contract, such a statement would be barred as being a legal conclusion, lacking foundation, and/or being argumentative.

### 3. <u>Alternatively, AFRC's Reconsideration Motion Should Have Been Granted.</u>

#### a. *AFRC's Evidence Relied on in its Motion for Reconsideration was "Newly Discovered" Evidence.*

Here, the key piece of evidence used in support of Plaintiffs' Motion for Reconsideration was a Dolphin 3-M Unitek Contract and deposition testimony regarding that contract – evidence which supports that the software did in fact contain AFRC's Patents. The Motions for Summary Judgment were fully briefed and oral argument was held on May 8, 2012. A18:13-14. While the motions were under submission, discovery continued. Third-party law firm Merchant & Gould responded to Plaintiff's subpoena on May 29, 2012 by producing a contract between Dolphin and another third party, 3-M Unitek (the "3-M Unitek Contract"), supports that Dolphin knew the software used AFRC's Patents. A18:16-20, 21-24.

After receiving the 3-M Unitek Contract on May 29, 2012, Plaintiffs took the Fed. R. Civ. P. 30(b)(6) depositions of Defendant's two designees, Richard Gluesenkamp and Chester Wang, on July 18 and July 19, 2012. A18:27-9:2. Both deponents were asked about the 3-M Unitek Contract. A19:2-3. The complete

48

deposition transcripts were first available to Plaintiffs on July 27, 2012, but not signed and finalized until, respectively, August 20 and August 27, 2012. A19:3-5. The Court issued an Order on August 10, 2012, granting Defendant's motion for summary judgment in full and denying Plaintiff's motion for partial summary judgment. A1:13.

Based on these facts, the District Court held that under Rules 59(e), 60(b), and L.R. 7-18, the fact that Plaintiffs had access to the 3-M Unitek Contract before the date of the Court's Order and Judgment (even though after the hearing), that the 3-M Unitek Contract was not new evidence. However, in the Ninth Circuit, a party moving for reconsideration of a grant of summary judgment based upon the availability of new evidence is only "obliged to show … that the evidence was newly discovered or unknown to it until after the *hearing*, [and] that it could not with reasonable diligence have discovered and produced such evidence at the *hearing*." *Engelhard Indus. v. Research Instrumental Corp.*, 324 F.2d 347, 352 (9th Cir.1963) (emphasis added); see also *Frederick S. Wyle P.C. v. Texaco, Inc.*, 764 F.2d 604, 609 (9th Cir.1985); see also *Trentacosta v. Frontier Pac. Aircraft Indus.*, 813 F.2d 1553, 1557–58 n. 4 (9th Cir.1987); see also *School Dist. No. 1J Multnomah County, Or. v. ACandS, Inc.*, 139 F.R.D. 164, 167-68 (D.Or.,1991); see also *Oliver v. Knowles*, 2008  Dist. LEXIS 42877, at *4 (E.D. Cal. 2008).  Here, the hearing on Patterson's Motion for Summary Judgment was held on May 8,

2012, but AFRC only had access to the 3-M Unitek Contract on May 29, 2012.

But, assuming, *arguendo*, that the "newly discovered" evidence is not considered new evidence if discovered after the hearing but prior to the order, although AFRC did have access to this document prior to the August 10, 2012 Order, AFRC was not able to question any of the 30(b)(6) designees until July 18, 2012, and did not obtain signed deposition transcripts until August 20 and 27, 2013, after entry of the Order.   A18:27-19:5.   Moreover, AFRC did not know, nor could AFRC have known, of the relevance of this evidence for purposes of the Motion for Summary Judgment until after issuance of the District Court's Order.  Because Patterson's Motion for Summary Judgment was based on Phase I, AFRC could not have anticipated that the District Court would make an implicit ruling on a Phase II issue – infringement of the patent.   In fact, even Patterson had understood such evidence to be a Phase II issue: AFRC asked for documents exchanged between Patterson and third-parties relating to AFRC's Patents, and Patterson refused to produce any new documents beyond that which it had already produced—a production that did not include the 3-M Unitek Contract. A2883:17-2884:2. The basis for its objection was that documents referencing patents were beyond the scope of Phase I. Patterson also moved to quash AFRC's subpoena to Merchant & Gould's (pursuant to which the 3-M Unitek Contract was eventually produced) on the ground that the subpoena sought documents outside the scope of Phase I

discovery. A2903-05.

In dismissing AFRC's patent infringement claims following Phase I, the Court necessarily made a finding regarding infringement: either that (a) the software did not practice the patents and therefore did not infringe the patents, or (b) the software infringed the patents, but Patterson had a license to practice the patents. Phase I was to be limited to issues of contract interpretation (license), and expressly excluded patent infringement. And, the Court found on Patterson's Phase I summary judgment motion that as a matter of law, Patterson was permitted to use "methodologies." However, there was no express finding as to whether AFRC's Patents were infringed. In dismissing AFRC's case, however, the Court also made an implicit finding on a Phase II issue, infringement – i.e., that the software did not incorporate or infringe the Patents. But, this issue was beyond the scope of Phase I, and the briefing. Thus, when this Court held that the 2001 Agreement does not convey a patent right, a Phase I issue was decided. Whether the software incorporated and/or infringed the Patents, however, was a Phase II issue.

In finding that the 2001 Agreement was not a patent license, yet dismissing the patent infringement claims, the Court had to have implicitly concluded that the software did not infringe the Patents—a Phase II issue. Given that Patterson's actual use of the Patents is a Phase II issue, AFRC could not have included the evidence in its summary judgment briefing even if it had the information prior to

their filings (which it did not) or "rushed" to the Court to present it between July 30, and the August 10, 2012 order because this evidence was beyond the Phase I scope.

### b.    AFRC was Diligent in Discovering the New Evidence.

The District Court also held that AFRC was not diligent in discovering the evidence, ruling that AFRC's counsel was present at the July 19 and July 20, 2012 Wang and Gluesenkamp depositions and that AFRC's failure to bring the substance of this testimony to the Court's attention before August 10, 2012, fails to show "reasonable diligence". A23:20-23. But how could AFRC have brought forth the evidence prior to obtaining the transcripts? Had AFRC's counsel merely declared what Messrs. Wang and Gluesenkamp said at their depositions, such statement would have surely been objected to as hearsay evidence. Had AFRC submitted deposition transcripts that had not yet been signed by Messrs. Wang and Gluesenkamp, Patterson would have surely objected that reliance on these unsigned transcripts is premature. Moreover, as addressed above, AFRC could not have known that the Court would implicitly rule on a Phase II issue.

### c.    The Evidence Regarding the 3-M Unitek Contract Would Have Changed The Outcome of the Case.

Essentially, the District Court held that this new evidence was cumulative. But in its Order, the Court held that AFRC transferred to Dolphin the right to

52

practice methodologies.  The Court could not have held that granting the right to practice the methodologies also conveyed the right to practice the Patents. Patent rights and state-based rights are distinct rights. See *State Contracting & Eng'g Corp. v. Florida*, 258 F.3d 1329, 1339-40 (Fed. Cir. 2001) (noting that patent rights and trade secret rights are distinct rights); *Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336, (Fed. Cir. 2001) (holding that the transfer of copyright, know-how, and technical expertise did not confer a patent license). Thus, by dismissing this action, the Court implicitly held that the software did not incorporate or infringe the Patents, but only used Dr. Arnett's state-based methodologies. However, Mr. Wang has since admitted that the software incorporates the Patents, thereby admitting Patterson has exceeded the scope of the rights the Court found Dr. Arnett granted to Dolphin. If a Phase II analysis confirmed the Patents were included in the software, and that each step of the patented methods appeared in the software, this would render Patterson an infringer. The new evidence shows that Dolphin and Patterson both knew the software incorporated the Patents. While AFRC argued in its motion that state-based methodologies and patents covering those same methods could not co-exist, Patterson used more than the state-based methodologies in the software, it used AFRC's federal Patents. The new evidence is thus not cumulative but a new branch of evidence that leads to AFRC's same-championed result.

Moreover, this newly uncovered evidence is not cumulative because it also applies to the District Court's equitable estoppel argument.

Those who seek equity from the Court must do equity in return. *In re Beaty,* 306 F.3d 914, 925 (9th Cir. 2002). See also *Operating Engineers Local Union No. 3 v. Burroughs*, 417 F.2d 370, 374 (9th Cir. 1969) ("It has been axiomatic that equitable relief will not be granted in a case wherein the plaintiff comes to the court with unclean hands."). The relief of equitable estoppel is unavailable to a party with unclean hands. *Chitkin v. Lincoln Nat. Ins. Co.*, 879 F.Supp. 841, 853 (S.D.Cal., 1995), citing *Ellenburg v. Brockway, Inc,*. 763 F.2d 1091, 1097 (9th Cir. 1985).

Here, Defendant represented, both in earlier hearings before this Court and in its summary judgment motion, that the 2001 Agreement was not a patent license and the software did not include Plaintiff's Patents. A1-13, 1992-2088; 1100-1136. But now, after the motions were heard, Plaintiff has discovered that not only did Mr. Wang know back in 2001 that the software included the Patents, but he purposefully used this fact to Dolphin's financial advantage by including it as a term in a contract with a third-party.

Defendant also knew about the 3-M Unitek Contract at least as of the date it acquired Dolphin in December 2008. Defendant's other 30(b)(6) designee – Mr. Gluesenkamp – confirmed in deposition that he (a) was aware of Plaintiff's patents

before the closing of the transaction with Dolphin and (b) was aware those patents were used in the Dolphin software (i.e., he reviewed the 3-M Unitek Contract as part of Defendant's due diligence process).  A2557-17; 2560:20-25; 2551:16-18.

Mr. Gluesenkamp, on behalf of Defendant, also acknowledged that a patent license would be required if patents were used in software. Since Mr. Gluesenkamp had already read the 3-M Unitek Contract, and was thus aware that AFRC's Patents were incorporated in the Dolphin software, he also knew that Defendant needed a patent license from Plaintiff. Despite this knowledge, and in complete disregard for Plaintiff's rights as a patent holder, Defendant proceeded to sell the software. A2547:25-2549:5

Mr. Wang, a Patterson FRCP 30(b)(6) designee, also testified that he knew that the Patents were included in the software.  Despite this superior knowledge, Defendant still told this Court that the 2001 Agreement was not a patent license, and that the software only used Dr. Arnett's methodologies, not Plaintiff's Patents. A1-13; 1992-2088; 1100-1136.  Because the newly discovered evidence shows that Patterson represented that the software did not use the Patents and that it did not have a patent license, all the while knowing since 2001 that the software included the Patents, Patterson has dirtied its hands such that it cannot avail itself of an equitable defense.

55

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

Because the District Court erred in granting summary judgment in Defendants' favor, and then erred in denying Plaintiffs' Motion for Reconsideration, Appellants respectfully request that the Court enter an order vacating the District Court's grant of summary judgment, its judgment, and its denial of the motion for reconsideration, and enter an order allowing the case to proceed on the merits.

DATED: July 2, 2013                    Respectfully submitted,

**FOLEY BEZEK BEHLE & CURTIS, LLP**

By: /s/ Roger N. Behle, Jr.
Roger N. Behle, Jr.
*Attorneys for Plaintiff-Appellant*
*Arnett Facial Reconstruction Courses, Inc.*
575 Anton Blvd., Suite 710
Costa Mesa, CA 92626
rbehle@foleybezek.com
(714) 556-1700

# ADDENDUM

## TABLE OF CONTENTS

**JUDGMENTS AND ORDERS APPEALED FROM**

Order Granting Defendant's Motion for Summary Judgment
Denying Plaintiff's  Motion for Summary Judgment [Doc. 90]...............................1

Judgment re:  Order Granting Defendant's Motion for Summary Judgment
Denying Plaintiff's  Motion for Summary Judgment [Doc. 96].............................14

Order Denying Plaintiff's Motion for Reconsideration [Doc. 143] .......................16

1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

9
10
11

| | |
|---|---|
| ARNETT FACIAL RECONSTRUCTION COURSES, INC., a California corporation, | Case No.: CV 11-06929 CBM (Ex) |
| Plaintiff, | **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| vs. | |
| PATTERSON DENTAL SUPPLY, INC., a Minnesota corporation d/b/a DOLPHIN IMAGING AND MANAGEMENTS SOLUTIONS; and DOES 1 through 10, inclusive, | |
| Defendant. | |

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

     The matters before the Court are Defendant Patterson Dental Supply, Inc.'s Motion for Summary Judgment on Plaintiff Arnett Facial Reconstruction Courses, Inc.'s Complaint [Docket No. 53] and Plaintiff Arnett Facial Reconstruction Courses, Inc.'s Motion for Partial Summary Judgment on Defendant Patterson Dental Supply, Inc.'s affirmative defenses contained in paragraphs 44, 45, 47, and 52 of the Answer and Counterclaim [Docket No. 58].

## FACTUAL AND PROCEDURAL BACKGROUND

On August 23, 2011, Plaintiff Arnett Facial Reconstruction Courses, Inc. ("AFRC" or "Plaintiff") filed a Complaint for claims of induced and contributory infringement of U.S. Patent No. 5,951,498 ("the '498 patent") and U.S. Patent No. 6,200,278 ("the '278 patent"). [*See* Complaint, Docket No. 1.] G. William Arnett ("Arnett") practiced the full scope of oral and maxillofacial surgery in Santa Barbara, California, with an emphasis in orthognathic surgery (surgery designed to correct conditions of the jaw and face). (Compl. at ¶ 10.) Arnett conceived of an idea in the field of cephalometric analysis, particularly a method of cephalometric analysis and planning that focused on "soft tissue" landmarks as opposed primarily to "hard tissue" landmarks. (*Id.* at ¶ 11.) Arnett was granted two patents from the United States Patents and Trademark Office for his treatment planning methods: the '498 patent, entitled "Soft Tissue Cephalometric Analysis for Diagnosis and Cephalometric Treatment Planning of Facial Imbalance" (*Id.* at ¶¶ 11, 12, Ex. A); and the '278 patent, entitled "Gender Specific Soft Tissue Cephalometric Analysis for Diagnosis and Cephalometric Treatment Planning of Facial Imbalance." (*Id.* at ¶¶ 11, 12, Ex. B.) Both the '498 patent and the '278 patent were later assigned to AFRC. (*Id.* at ¶ 11.) AFRC is therefore the assignee/owner of the '498 patent and the '278 patent. (*Id.*) AFRC also specializes in the business of designing and conducting educational courses in the field of orthognathic surgery. (*Id.* at ¶ 13.) Arnett is an officer and agent of AFRC. (*Id.*)

AFRC alleges that in late 2000, Arnett began discussions with Defendant Dolphin Imaging Systems, LLC ("Dolphin") through its agent Chester Wang ("Wang") to form a joint venture to develop and sell computer software products (the "Software") based on the patents. (*Id.* at ¶ 14.) In January 2001, Arnett entered into a licensing agreement ("2001 Licensing Agreement") with Dolphin to develop and sell the Software. (*Id.* at ¶ 15.) The 2001 Licensing Agreement

provided that Arnett and Dolphin would jointly develop software for "soft tissue cephalometric analysis for diagnosis and treatment planning of facial imbalance." (*Id.*) On August 6, 2003, Arnett and Dolphin amended the licensing agreement ("2003 Amendment") to modify the royalty payment terms. (*Id.* at ¶ 18.)

AFRC contends that Arnett first learned in December 2008 that Dolphin had been acquired by Defendant Patterson Dental Supply, Inc. ("Defendant" or "PDS"). (*Id.* at ¶ 20.) Neither AFRC nor Arnett received any payment or other remuneration in connection with the acquisition. (*Id.* at ¶ 21.) AFRC alleges that Dolphin stopped paying royalties, as required by the 2001 Licensing Agreement and 2003 Amendment, as of the spring of 2009. (*Id*. at ¶ 22.) AFRC further alleges that Dolphin and PDS have refused repeated requests to provide information regarding the rights and interests that PDS "acquired" from Dolphin. (*Id*.) AFRC also contends that the 2001 Licensing Agreement was nonexclusive and personal to Dolphin, and therefore is not assignable absent AFRC's consent. *(Id*.) Moreover, the 2011 Licensing Agreement did not include any provision allowing for the transfer or assignment of any rights by Dolphin. (*Id.*) AFRC therefore alleges that PDS continues to sell the Software without consent, which amounts to patent infringement. (*Id.* at ¶¶ 26, 35.)

This case is currently divided into two phases. Phase I, "including discovery, shall be limited to historical issues and damages issues: the 2001 Agreement and 2003 Amendment and other understandings and communications between and during the life of the Dolphin relationship with Arnett; the terms of [PDS's] acquisition of [Dolphin]; and [PDS's] sales of the Arnett module after it acquired Dolphin." Phase II, if necessary, shall include "discovery and other litigation proceedings on any remaining issues" that are directly related to the two patents. [*See* Rule 16 Scheduling Order, Docket No. 36, ¶¶ 2-3; *see also,* Minutes of Scheduling Conference, Docket No. 41.]

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## STANDARD OF LAW

Summary judgment is appropriate if, viewing the evidence in the light most favorable to the nonmoving party, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Ellison v. Robertson*, 357 F.3d 1072 (9th Cir. 2004). A genuine dispute is "one that could reasonably be resolved in favor of either party." *See Ellison*, 357 F.3d at 1075. It is for the court to determine "whether there exists a genuine issue for trial, not to weigh the evidence…and determine the truth of the matter." *Baxter v. MCA, Inc.,* 812 F.2d 421, 424 (9th Cir. 1987); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). "[S]ummary judgment will not lie if ... the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. A court may also enter partial summary judgment if the entire relief requested cannot be granted. FED. R. CIV. P. 56(a).

The moving party bears the initial burden of establishing the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). When a defendant moves for summary judgment on an issue on which the plaintiff bears the burden of proof, the defendant bears his burden at the summary judgment stage by "pointing out to the district court [] that there is an absence of evidence to support the nonmoving party's case." *Id.*. If the moving party meets its initial burden, the nonmoving party must then set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250.

## DISCUSSION

Based upon the parties' evidence, arguments and all of the files, records, and proceedings in this matter, the Court makes the following findings of fact and conclusions of law:

4

## I.     FINDINGS OF FACT

1.     G. William Arnett ("Arnett"), a surgeon, developed innovative "methodologies" of analyzing and planning orthognathic surgery, *i.e.*, surgery of the face, especially the jaws and soft tissue, to promote facial balance.  [Compl., at ¶¶ 10-11.]

2.     On October 15, 1997, Arnett executed an assignment document conveying his entire right, title, and interest in the invention of the provisional patent application to Plaintiff Arnett Facial Reconstruction Courses, Inc. ("AFRC"). [Assignment Documents, Feb. 23, 2012, Arnett Dep. Ex. 1005, attached to Halaby Decl. Ex. A; Arnett Dep., at 24:3-7, 12-15, 20-23, 25:2, 5-10, 27:17-19, attached to Halaby Decl. Ex. A.]

3.     On October 16, 1997, Arnett filed a provisional patent application, Application No. 60/062,433, entitled "Method of Cephalometrics Analysis," with the United States Patent and Trademark Office ("USPTO"). [Compl. Ex. A (United States Patent No. 5,951,498), at 1; Compl. Ex. B (United States Patent No. 6,278,200), at 1.]

4.     On August 3, 1998, Arnett filed a patent application, Application No. 09/128,378, based upon the provisional patent application with the USPTO.  A patent on Application No. 09/128,378, United States Patent No. 5,951,498, entitled "Soft tissue cephalometric analysis for diagnosis and cephalometric treatment planning of facial imbalance," ("the ′498 Patent"), was issued on September 14, 1999. [′498 Patent, Compl. Ex. A, at 1.]

5.     On September 14, 1999, Arnett filed Application No. 09/394,735, with the USPTO.  A patent on Application No. 09/394,735, United States Patent No. 6,200,278 ("the ′278 patent"), entitled "Gender specific soft tissue cephalometric analysis for diagnosis and cephalometric treatment planning of facial imbalance,"

5

was issued on March 13, 2001.  [Arnett Decl., at ¶ 5, Ex. A; ′278 patent, Compl. Ex. B, at 1.]

6.     The '498 patent and the '278 patent are the patents-in-suit.  (*See* Compl., at ¶¶ 24-41.)

7.     On March 26, 1998, Arnett recorded the October 15, 1997 assignment with the USPTO.  [Assignment Documents, Feb. 23, 2012, Arnett Dep. Ex. 1005, attached to Halaby Decl. Ex. A; Arnett Dep., at 24:3-7, 12-15, 20-23, 25:2, 5-10, 27:17-19, attached to Halaby Decl. Ex. A.]

8.     On November 21, 2000, Arnett executed an assignment document conveying his entire right, title, and interest in the invention of Application No. 09/394,735 to AFRC.  [*Id.*]

9.     On February 21, 2001, Arnett recorded the November 21, 2000 assignment with the USPTO. [*Id.*]

10.     AFRC is wholly owned and controlled by Arnett and has been since it was formed. [Arnett Dep., at 10:16-11:2, 11:9-14, 21-23.]

11.     As of January 2001, Dolphin Imaging Systems, LLC ("Dolphin") was in the business of providing imaging, diagnostic, and case presentation software for dental specialty professionals.  [Compl., at ¶ 6.]

12.     Arnett and Dolphin entered into an agreement dated January 31, 2001 (the "2001 Agreement"). [2001 Agreement, Arnett Dep., at 12-14, Ex. 1010, attached Halaby Decl., Ex. A; Arnett Dep., at 13:8-10. 15:9-12.]

13.     Negotiation of the terms of the 2001 Agreement occurred exclusively between Arnett and Chester Wang, Dolphin's chief executive officer.  [Arnett Dep., at 52:23-12, 53:14-24.]

14.     The methodologies described in the 2001 Agreement are some of the methodologies covered by the ′498 Patent and the ′278 patent.  [Arnett Dep., at 17:11-12, 17:20-18:4, 19:2-7, 12-25, 20:11-16, 55:17-20; Plaintiff's Responses to

Requests for Admission, Set One, Request No. 3, 2:15-21, attached to the Behle Decl. Ex. S].

15.     The 2001 Agreement does not use the word "patent." [Arnett Dep., at 55:17-20.]

16.     Arnett did not understand the 2001 Agreement to confer any exclusive rights on Dolphin.  [*See* Feb.24, 2003 Letter from P. Slaughter to C. Wang, Arnett Dep. Ex. 1010, at 12-14, attached to Halaby Decl. Ex. A (offering exclusive rights); Arnett Dep., at 75:16-79:10 (testifying that he is unable to identify any inaccuracies in the letter).]

17.     Neither Arnett nor AFRC caused the 2001 Agreement to be recorded with the USPTO. [Def.'s Statement of Uncontroverted Facts and Conclusions of Law in Support of its Motion for Summary Judgment ("DSOF"), at ¶ 21.]

18.     The 2001 Agreement was amended on August 6, 2003 (the "2003 Amendment"). [Arnett Dep. Ex. 1002, included in Halaby Decl. Ex. A; *see also* Arnett Dep., at 75:16-79:10, 80:13-15;80:17-81:13, 16-25, 85:12-18, 85:20-86:2, 90:13-21 ,91:7-14, 92:3.]

19.     Neither Arnett nor AFRC caused the 2003 Amendment to be recorded with the USPTO.  [DSOF, at ¶ 27.]

20.     In December 2008, Defendant Patterson Dental Supply, Inc.  acquired all of the membership interests and rights in Dolphin.  [Compl., at ¶ 8; Wang Decl., at ¶ 8.] PDS now conducts the business operations formerly conducted by Dolphin. [*Id.*]

21.     PDS has succeeded to Dolphin's position as a party to the 2001 Agreement, as amended by the 2003 Amendment.  [First Amended Complaint, filed by plaintiffs G. William Arnett and Arnett Facial Reconstruction Course, Inc. on January 11, 2012, Superior Court of California for the County of Santa Barbara, Case No. 1382450, at ¶ 80 ("Arnett performed each and every covenant and

condition of his agreements with Dolphin and its successor Patterson….”); *Id.*, at ¶ 79(f) (“Implied in the written 2001 Licensing Agreement and 2003 Amendment between Arnett and Dolphin, and its successor Patterson, is a covenant of good faith and fair dealing….”); *Id.*, at ¶ 79(g) (“[b]y Dolphin and its successor”); Wang Decl., at ¶ 8 (“In December 2008, PDS acquired all of the membership interests and rights in Dolphin, and succeeded to Dolphin’s rights under the 2001 Agreement, as amended.  I had primary responsibility for negotiating the acquisition on behalf of Dolphin.  PDS now conducts the business operations formerly conducted by PDS.”).]

22.     Arnett had accepted payments from PDS under the 2001 Agreement, as amended.  Arnett accepted $85,613.20 in payments from PDS after it acquired Dolphin in 2008, between May 14, 2002 and November 4, 2011.  (Wang Decl., at ¶¶ 7, 9 & Exs. A, B; Arnett Dep. at 87:12-13, 15-16, 88:3-9, 14-19.)

23.     AFRC is the owner of both patents-in-suit, having been assigned the patents-in-suit by Arnett.  [Arnett Decl., at ¶¶ 4-9.]

24.     At all times relevant to the Complaint, AFRC has been the exclusive holder of all right, title, and interest in the ’498 patent and the ’278 patent. [Compl., at ¶¶ 25, 34.]

25.     The 2001 Agreement and 2003 Amendment are governed by California law. [Comp., at ¶ 15; 2001 Agreement, Exhibit A to the First Amended Complaint.]

## II.   CONCLUSIONS OF LAW

1.     Arnett conveyed PDS a warranted, potentially perpetual, and fully assignable right — embodied in the 2001 Agreement, as amended by the 2003 Amendment to that agreement — to practice the methodologies that correspond to those of the two patents-in-suit, the ’498 patent and the ’278 patent.  [Arnett Dep. Ex. 1002, attached to Halaby Decl. Ex. A.)

2.     Arnett, who owns and controls AFRC, conveyed to Dolphin in the 2001 Agreement, as amended, the right to use the methodologies separate and apart from any patent rights Arnett or AFRC may hold.  *See, e.g.*, *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 262-63, 266 (1979) (holding agreement to pay royalties for an idea, for which the patent application was rejected, enforceable under state contract law); *Jacobs v. Nintendo of America, Inc.,* 370 F.3d 1097, 1101 (Fed. Cir. 2004) (affirming summary judgment for the defendant on patent infringement claim where an agreement entered into by the plaintiff granted the right to make and sell devices that incorporated the patented property); *Standard Sewing Mach. Co. v. Jones*, 260 F. 170, 175-176 (3d Cir. 1919) (holding damages are limited to those arising from breach of contract, not from infringement, where the contract granted the right to sell a patented sewing machine).

3.     The terms of the 2001 Agreement, as amended, speaks of methodologies, not patents.  One of the patents-in-suit, the '278 patent, had not yet issued when the 2001 Agreement was signed.  ['278 patent, Compl. Ex. B, at 1.]

4.      The 2001 Agreement has no fixed duration, and specifically has no duration of any patent right.  *See Aronson*, 440 U.S. at 264-65.

5.     The 2001 Agreement provided that it was governed by California law, rather than federal law.  [2001 Licensing Agreement, Halaby Decl., Ex. A ("11. Governing Law. This agreement shall be governed in all respect by the laws of the State of California."); *see also* Arnett Dep., at 13:8-10, 15:9-12.]

6.     The 2001 Agreement was not recorded with the United States Patent and Trademark Office.  [*Id.*]

7.     PDS succeeded to Dolphin's rights under the 2001 Agreement, as amended, by virtue of: (1) PDS's acquisition of Dolphin in late 2008 [Compl., at ¶ 8; Wang Decl. at ¶ 8]; (2) Arnett's acceptance of monies under the 2001 Agreement, as amended, from Dolphin before the acquisition and from PDS after

9

the acquisition [Wang Decl., at ¶¶ 7-9 & Exs. A, B; Arnett Dep., at 87:12-13, 15-16, 88:3-9, 14-9], and (3) Arnett's and AFRC's admissions that PDS has succeeded Dolphin as a party to the 2001 Agreement, as amended. [Aug. 20, 2010 Letter from R. Behle to C. Wang, Arnett Dep. Ex. 1006, attached to Halaby Decl. Ex. A ("the 2001 Agreement and 2003 Amendment utilize gross receipts as the basis of calculating royalties due our clients").]

8.     PDS owns the Dolphin software it acquired in connection with its acquisition of the membership rights and interests in Dolphin. PDS similarly has the right to distribute and sell the software. PDS has the right to make, use, sell, and offer for sale the software because Arnett sold Dolphin the right to use his methodologies in the software. [*Id.*]

9.     AFRC has no cause of action against PDS for making, using, selling, or offering to sell the software. *See, e.g.*, CAL. CIV. CODE § 954 (West, Westlaw through 2012 Sess.) ("A thing in action arising . . . out of an obligation, may be transferred by the owner); CAL. CIV. CODE §1458 (West, Westlaw through 2012 Sexx.) (providing that contractual rights are generally assignable); RESTATEMENT (SECOND) OF CONTRACTS § 317 (1981) (stating that contractual rights are generally assignable); *see also, e.g.*, *Jacobs*, 370 F.3d at 1101 ("[A] party may not assign a right, receive consideration for it, and then take steps that would render the right commercially worthless."); *Galbraith v. Resurgent Capital Servs.,* No. CIV S 05-2133 KJM, 2006 WL 2990163, at *1-2 (E.D. Cal. Oct. 19, 2006) (Mueller, Mag.) (equitable estoppel permits a successor of a party to an agreement to invoke the agreement's arbitration clause when it is sued for the violation of a right under the agreement) (citing *Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006)).

10.     PDS may invoke an equitable estoppel defense against AFRC. *See* Findings of Fact No. 22; "[T]he elements of an equitable estoppel defense . . . include: (1) communication or action by the patentee indicating that the alleged

infringer will not be disturbed in his activities; (2) reliance by the alleged infringer on the patentee's conduct; [and] (3) material prejudice by the alleged infringer if the patentee is allowed to proceed (citation omitted)."  *Raber v. Pittway Corp.*, 1994 WL 374542, at \*5 (N.D. Cal. July 11, 1994) (Smith, J.); *see also Windbond Elecs. Corp. v. Int'l Trade Comm'n,* 262 F.3d 1363, 1374 (Fed. Cir. 2001) ("[a]n implied license may arise by equitable estoppel, acquiescence, conduct, or legal estoppel"). An estoppel defense may be invoked by a corporate successor based on conduct directed to its predecessor entity.  *Jamesbury Corp v. Litton Indus. Prods., Inc.*, 839 F.2d 1544, 1555 (Fed. Cir. 1988) (successor-in-interest to original infringer entitled to rely on lack of communication to predecessor-in-interest from patentee for purposes of demonstrating reliance), *overruled on other grounds by A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1042 (Fed. Cir. 1992).  "To demonstrate reliance, the infringer must show a relationship with the patentee which lulled the infringer into a sense of security in continuing his activity." *Raber*, 1994 WL 374542, at \*5.

## III.  REQUESTS FOR JUDIAL NOTICE

Federal Rule of Evidence 201 enables a court to take judicial notice of adjudicative facts.  FED. R. EVID. 201.  A fact may be judicially noticed if it is "not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  FED. R. EVID. 201(b). Courts may take judicial notice of facts that are a matter of public record.  *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001); *Mack v. South Bay Beer Distribs. Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986), *overruled in part on other grounds by Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104 (1991). Courts may take judicial notice of public court filings that are not subject to reasonable dispute, in that they are capable of accurate and ready determination by

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

resort to the court's own files. *See Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank*, 136 F.3d 1360, 1364 (9th Cir. 1998). Accordingly, the Court will take judicial notice of the following documents:

1.    Second Amended Complaint, filed by plaintiffs G. William Arnett and Arnett Facial Reconstruction Courses, Inc. on July 7, 2011, in United States District Court for the Central District of California, Case No. CV 11-01199 CBM (Ex), Docket No. 26;

2.    First Amended Complaint, filed by plaintiffs G. William Arnett and Arnett Facial Reconstruction Course, Inc. on January 11, 2012, Superior Court of California for the County of Santa Barbara, Case No. 1382450;

3.    Plaintiffs' Opposition to Defendants' Motion to Dismiss; Memorandum of Points and Authorities in Support Thereof, filed by plaintiffs G. William Arnett and Arnett Facial Reconstruction Courses, Inc. on May 31, 2011, in United States District Court for the Central District of California, Case No. CV 11-01199 CBM (Ex), Docket No. 20;

4.    Plaintiffs' Notice of Motion and Motion for Remand, filed by plaintiffs G. William Arnett and Arnett Facial Reconstruction Courses, Inc. on September 14, 2011, in United States District Court for the Central District of California Case No. CV 11-07060 CBM (Ex), Docket No. 10.

5.    PTO Application Summary for Application Number 60/062,433, available on uspto.gov website.

6.    First Amended Complaint, filed by plaintiffs G. William Arnett and Arnett Facial Reconstruction Course, Inc. on February 10, 2011, in the United States District Court for the Central District of California, Case No. CV 11-01199 CBM (Ex), Docket No. 8;

7. Answer and Counterclaim, filed by Defendant Patterson Dental Supply, Inc. on November 3, 2011, in United States District Court for the Central District of California, Case No. CV 11-6929 CBM (Ex), Docket No. 26.

## CONCLUSION

For the foregoing reasons, the Court finds in favor of Defendant. To the extent that any findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

Defendant's Motion for Summary Judgment is hereby **GRANTED**. [Docket No. 53.] Therefore, Defendant's alternative motion to limit AFRC's recoverable damages to the compensation amounts set forth in the August 6, 2003 written agreement between Dolphin and Arnett is **DENIED AS MOOT**. Plaintiff's Motion for Partial Summary Judgment as to Defendant's affirmative defenses contained in Paragraphs 44, 45, 47, and 52 of its Answer and Counterclaim is hereby **DENIED**. [Docket No. 58.]

**IT IS SO ORDERED.**

Dated: August 10__, 2012          By: _[signature]_

_____

HONORABLE CONSUELO B. MARSHALL

United States District Court Judge

13

No J56

1
2
3
4
5
6
7
8
9
10
11
12

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ARNETT FACIAL RECONSTRUCTION COURSES, INC., a California Corporation, | Case No. 11-CV-06929-CBM (E) |
| Plaintiff, | |
| v. | [~~PROPOSED~~] JUDGMENT |
| PATTERSON DENTAL SUPPLY, INC., a Minnesota corporation d/b/a DOLPHIN IMAGING AND MANAGEMENT SOLUTIONS and DOES 1 through 10, inclusive, | |
| Defendants. | |
| AND RELATED COUNTERCLAIMS. | |

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Snell & Wilmer
L.L.P.
LAW OFFICES
350 South Grand Avenue, Suite 2600, Two California Plaza
Los Angeles, California 90071
(213) 929-2500

1       For the reasons set forth in the Court's Order Granting Defendant's Motion

2   for Summary Judgment and Denying Plaintiff's Motion for Partial Summary

3   Judgment dated August 10, 2012, Dkt. # 90;

4       And in light of the stipulation by and between Defendant/Counterclaimant

5   Patterson Dental Supply, Inc. ("PDS") and Plaintiff/Counter-Defendant Arnett

6   Facial Reconstruction Courses, Inc. ("AFRC"), and the Court's Order thereon,

7   dismissing without prejudice PDS's counterclaims for a declaratory judgment of

8   invalidity and unenforceability pursuant to Federal Rule of Civil Procedure

9   41(a)(1)(A)(ii);

10  **IT IS ORDERED AND ADJUDGED** that judgment be and is hereby

11  entered in favor of PDS on all causes of action asserted by AFRC, and that

12  judgment be entered in favor of PDS on PDS's counterclaim for a declaratory

13  judgment of non-infringement (Count I of PDS's Answer and Counterclaim).

14  PDS's counterclaims for a declaratory judgment of invalidity (Count II) and

15  unenforceability (Count III) shall be and hereby are dismissed without prejudice.

16  **IT IS FURTHER ORDERED AND ADJUDGED** that PDS is the

17  prevailing party entitled to recover costs pursuant to Local Rule 54-4.

18  **IT IS SO ORDERED.**

19

20  Dated: ~~August ___, 2012~~ September 5, 2012

21

22

23  CONSUELO B. MARSHALL
    UNITED STATES DISTRICT JUDGE

24

25

26

27

28

Snell & Wilmer
L.L.P.
LAW OFFICES
350 South Grand Avenue, Suite 2600, Two California Plaza
Los Angeles, California 90071
(213) 929-2500

1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

11
12
13
14
15
16
17
18
19
20
21

| | |
|---|---|
| ARNETT FACIAL RECONSTRUCTION COURSES, INC., a California corporation,<br><br>                  Plaintiff,<br><br>vs.<br><br>PATTERSON DENTAL SUPPLY, INC., a Minnesota corporation d/b/a DOLPHIN IMAGING AND MANAGEMENTS SOLUTIONS; and DOES 1 through 10, inclusive,<br><br>                  Defendant. | Case No.:   CV 11-06929 CBM (Ex)<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR RECONSIDERATION** |

22
23
24
25
26
27

      The matter before the Court is Plaintiff Arnett Facial Reconstruction Courses, Inc.'s ("Plaintiff") Motion for Reconsideration of the Court's August 10 Order Granting Defendant's and Denying Plaintiff's Motion for Summary Judgment, Or in the Alternative, To Alter or Amend Judgment (the "Motion") [Docket No. 97]. Plaintiff has also filed a Request for Judicial Notice. [Docket No. 98.]

28

16

**FACTUAL BACKGROUND**

The United States Patent and Trademark Office issued two patents to Dr. G. William Arnett, an officer of Plaintiff Arnett Facial Reconstruction Courses, Inc. ("Plaintiff"), based on his treatment planning methods in the field of cephalometric analysis: U.S. Patent No. 5,951,498 ("Patent '498"), entitled "Soft Tissue Cephalometric Analysis for Diagnosis and Cephalometric Treatment Planning of Facial Imbalance" (Complaint ("Compl.") at ¶¶ 11, 12, Ex. A); and U.S. Patent No. 6,200,278 ("Patent '278'"), entitled "Gender Specific Soft Tissue Cephalometric Analysis for Diagnosis and Cephalometric Treatment Planning of Facial Imbalance." (*Id.* at ¶¶11, 12, Ex. B.) Patent '498 issued on September 14, 1999, and Patent '278 issued on March 13, 2001. (*Id.*) Both of the Patents were assigned to Plaintiff. (*Id.* at ¶ 11.)

In late 2000, Plaintiff began discussions with Defendant Dolphin Imaging Systems, LLC ("Dolphin") through its agent Chester Wang to form a joint venture to develop and sell computer software products ("Software") based on some of the methodologies disclosed in the Patents. (*Id.* at ¶ 14; Plaintiff's Statement of Genuine Disputes in Opposition to Defendant's Motion for Summary Judgment ("GD") at ¶¶ 12-13, 15, Docket No. 68.)

Dolphin was acquired by Defendant Patterson Dental Supply, Inc. ("Defendant" or "PDS") in December 2008. (Compl. at ¶ 20; GD at ¶ 28.) PDS continued sell the Software and paid Plaintiff. (Compl. at ¶¶ 19, 21; GD at ¶¶ 31-32.)

**PROCEDURAL BACKGROUND**

Plaintiff filed a Complaint against Dolphin and PDS on August 23, 2011, for claims of: (1) infringement of Patent '498 - induced and contributory infringement, and (2) infringement of Patent '278 - induced and contributory infringement. [Docket No. 1.]

17

Pursuant to Court order, at the parties' request, the case was divided into two phases. (*See* [Proposed] Rule 16 Scheduling Order at 2-3, Docket No. 36.) Phase I, "including discovery, shall be limited to historical issues and damages issues: the 2001 Agreement and 2003 Amendment and other understandings and communications between and during the life of the Dolphin relationship with Arnett; the terms of [PDS's] acquisition of [Dolphin]; and [PDS's] sales of the Arnett module after it acquired Dolphin." (*Id.*; *see also* Minutes of Scheduling Conference, Docket No. 41.) Phase II, if needed, would include "discovery and other litigation proceedings on any remaining issues" that are directly related to the Patents. (*Id.*)

Following discovery on Phase I issues concerning historical and damages issues, the parties filed cross-motions for summary judgment on March 15, 2012. [Docket Nos. 53, 58.] The motions were fully briefed and oral argument was held on May 8, 2012. [Docket No. 82.] Following oral argument, the motions were taken under submission. (*Id.*)

While the motions were under submission, discovery continued. Third-party law firm Merchant & Gould responded to Plaintiff's subpoena on May 29, 2012 by producing a contract between Dolphin and another third party, 3M Unitek (the "Dolphin-3M Contract"). (Motion at 7:11-8:13.) The Dolphin-3M Contract provided that

> Dolphin is currently developing an orthodontic and surgical planning and treatment software module utilizing the philosophies of Dr. G. William Arnett ("Arnett"), an oral-maxillofacial surgeon. Some information used in this module . . . is protected under several U.S. and International patents authored by Arnett.

(Motion at 8:10-13; Declaration of Roger N. Behle, Jr. In Support of Motion for Reconsideration ("Behle Decl."), Ex. 1 at 1.2.)

After receiving the Dolphin-3M Contract on May 29, 2012, Plaintiffs took the Fed. R. Civ. P. 30(b)(6) depositions of Defendant's two designees, Richard

18

Gluesenkamp and Chester Wang, on July 18 and July 19, 2012. (Motion at 3:11-23.) Both deponents were asked about the Dolphin-3M Contract. (*Id*. at 8:16-9:24.) The complete deposition transcripts were first available to Plaintiffs on July 27, 2012, but not signed and finalized until, respectively, August 20 and August 27, 2012. (*Id*. at 9:26-10:2.)

The Court issued an Order on August 10, 2012, granting Defendant's motion for summary judgment in full and denying Plaintiff's motion for partial summary judgment. [Docket No. 90.] The Court concluded that "[Plaintiff's officer] conveyed to Dolphin in the 2001 Agreement, as amended, the right to use the methodologies separate and apart from any patent rights." (Aug. 10 Order at 9:1-4.) The Court further concluded that "PDS may invoke an equitable estoppel defense against [Plaintiff]." (*Id*. at 10:25-26.) The Court entered judgment in favor of PDS on September 5, 2012. [Docket No. 96.]

Plaintiff now moves for reconsideration of the Court's August 10 Order based on the new evidence discovered in the 3M-Dolphin Contract and Mssrs. Wang and Gluesenkamp's 30(b)(6) deposition testimony concerning the 3M-Dolphin Contract. Plaintiff argues that the new evidence requires reconsideration because it is an admission by PDS that Dolphin's Software incorporated the Patents and PDS' sale of the software without Plaintiff's consent infringes the Patents. (Motion at 13:25-28.)

## STANDARD OF LAW

"The Federal Rules of Civil Procedure do not expressly recognize a 'motion for reconsideration.'" *Boles v. Merscorp, Inc*., CV 08-1989PSG(EX), 2009 WL 650631, at *1 (C.D. Cal. Mar. 11, 2009) (*citing Clough v. Rush*, 959 F.2d 182, 186 n.4 (10th Cir.1992)). A motion for reconsideration is typically brought as a motion to alter or amend a judgment under Federal Rule of Civil Procedure 59(e) ("Rule 59(e)") or a motion for relief from judgments or orders under Federal Rule of Civil Procedure 60(b) ("Rule 60(b)"). (*Id*.)

19

**Motions for Reconsideration Under the Federal Rules**

Rule 60(b)(2) provides that "[o]n motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for . . . newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)." A Rule 60(b)(2) motion can be made where newly discovered evidence would probably produce a different result. *Feature Realty, Inc. v. City of Spokane*, 331 F.3d 1082, 1093 (9th Cir. 2003). This evidence must be material and cannot be merely cumulative or impeaching. *Id.* Evidence is not newly discovered if it was "in the possession of the party before judgment was rendered." *Coastal Transfer Co. v. Toyota Motor Sales, U.S.A., Inc.*, 833 F.2d 208, 212 (9th Cir. 1987). Finally, a motion made pursuant to Rule 60(b)(2) must be made "within a reasonable time." Fed. R. Civ. Pro. 60(c)(1).

Rule 59(e) provides that "[a] motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment." "Although Rule 59(e) permits a district court to reconsider and amend a previous order, the rule offers an extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources." *Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000) (internal quotation marks omitted). "[A] motion for reconsideration should not be granted, absent highly unusual circumstances, unless the district court is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 880 (9th Cir. 2009) (quoting *389 Orange St. Partners v. Arnold*, 179 F.3d 656, 665 (9th Cir. 1999)). Furthermore, a motion "may not be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation." *Marlyn Nutraceuticals*, 571 F.3d at 880 (internal quotation marks omitted).

20

**Motions for Reconsideration Under Local Rule 7-18**

In this district, motions for reconsideration are also governed by Local Rule 7-18, which states:

> A motion for reconsideration of the decision on any motion may be made only on the grounds of (a) a material difference in fact or law from that presented to the Court before such decision that in the exercise of reasonable diligence could not have been known to the party moving for reconsideration at the time of such decision, or (b) the emergence of new material facts or a change of law occurring after the time of such decision, or (c) a manifest showing of a failure to consider material facts presented to the Court before such decision.

L.R. 7-18. Rule 7-18 states that "[n]o motion for reconsideration shall in any matter repeat any oral or written argument made in support of or in opposition to the original motion." *Id.*

## DISCUSSION

Plaintiff argues that the proffered evidence is new within the meaning of Fed. R. Civ. P. 59(e) and 60(b) as well as material evidence of PDS' infringement of the Patents.[1]

## I.     Fed. R. Civ. P. 59(e) and 60(b)

In order to obtain relief from judgment under either Rule 59(e) or Rule 60(b) due to newly discovered evidence, Plaintiff must satisfy the same test. *See Jones v. Aero/Chem Corp.*, 921 F.2d 875, 878 (9th Cir. 1990) ("[T]he test applied to a Rule 59 motion alleging newly discovered evidence is borrowed from Rule 60(b)(2)."); 11 Charles A. Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 2859 (2d ed. 1987) ("The same standard applies to motions on the ground of newly discovered evidence whether they are made under Rule 59 or Rule 60(b)(2), and

---

[1]     Plaintiff moves for reconsideration pursuant to Rules 59(e) and 60(b) as well as Local Rule 7-18. Where a motion seeks relief under the Local Rules as well as other federal rules, the court must review the motion under each appropriate rule. *See* Rutter Group, <u>Practice Guide, Federal Civil Procedure before Trial</u> § 12:160.7 (citing *Hinton v. Pac. Enters.*, 5 F.3d 391, 395 (9th Cir. 1993)).

decisions construing Rule 59 in this context are authoritative in construing Rule 60(b)(2).")  Plaintiff must show that (1) the evidence was discovered after the Court's ruling; (2) the exercise of due diligence would not have resulted in the evidence being discovered at an earlier stage; and (3) the newly discovered evidence is of such magnitude that production of it earlier would likely have changed the outcome of the case.  *Ybarra v. McDaniel*, 656 F.3d 984, 998 (9th Cir. 2011), *cert. denied*, 133 S, Ct, 424 (2012); *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 992-93 (9th Cir. 2001).

### A.    Plaintiff's Evidence Was Available Prior to the Court's Order

The 3M-Dolphin Contract and Mssrs. Wang and Gluesenkamp's deposition testimony are not "new" for purposes of Rules 59(e) and 60(b)(2).  Evidence discovered prior to issuance of the Court's August 10 Order is not "new."  *See Hecker v. Deere & Co.*, 556 F.3d 575, 590 (7th Cir. 2009) (denying a motion for reconsideration under Rule 59, the Seventh Circuit explained "[t]hat is why this court has held that the assessment of newness turns on the date of the court's dispositive order . . . ."); *Feature Realty, Inc. v. City of Spokane*, 331 F.3d 1082, 1093 (9th Cir. 2003) (citations omitted) (denying reconsideration under Rule 60(b)(2) where counsel received new information eight days before the entry of judgment and holding "[e]vidence 'in the possession of the party before the judgment was rendered is not newly discovered.'"); *Lake Hill Motors, Inc. v. Jim Bennett Yacht Sales, Inc.*, 246 F.3d 752, 757-58 (5th Cir. 2001) (denying reconsideration under Rule 59(e) where new evidence was received on August 9, 1999, and the district court did not issue its summary judgment until August 23, 1999).  It is undisputed that Plaintiff was in possession of the 3M-Dolphin Contract by May 29, 2012.  (Motion at 13:9-10.)  It is also undisputed that the depositions of Mssrs. Wang and Gluesenkamp took place on July 19 and July 20, 2012. (Motion at 3:18-23.)  The Court finds that Plaintiff fails to satisfy the first requisite of "new" evidence.

**B.    Even if "New," Plaintiff Was Not Diligent in Discovering the Evidence**

In the alternative, Plaintiff argues that its evidence is new because Plaintiff did not receive the executed and corrected deposition transcript for Mr. Gluesenkamp's deposition until August 20, 2012, and did not receive the executed and corrected transcript for Mr. Wang's deposition until August 27, 2012.  (Motion at 7:12-15.)

Assuming *arguendo* that Plaintiff's proffered evidence was not discovered until after the Court's August 10 Order issued, Plaintiff nonetheless cannot show that it was reasonably diligent in discovering the evidence.  Plaintiff is not reasonably diligent in discovering new evidence where Plaintiff knows of the evidence but waits until it is in a more accurate form.  *See Metoyer v. Chassman*, 248 F. App'x 832, 835 (9th Cir. 2007) ("[W]e agree with the district court that [Plaintiff] has failed to make a sufficient showing that the information contained in the tape could have not been discovered with reasonable diligence. [Plaintiff] was at the meeting, as were some of her co-workers who submitted declarations in her support.  There is no reason [Plaintiff] or at least one of her co-worker witnesses, would not have personal knowledge of anything material said at the meeting. Their recollection of what was said would be admissible evidence, if perhaps not as accurate and dramatic as the tape recording.")  Likewise Plaintiff's counsel was present at the July 19 and July 20, 2012 Wang and Gluesenkamp depositions and Plaintiff's failure to bring the substance of this testimony to the Court's attention before August 10, 2012, fails to show "reasonable diligence."

**C.    Plaintiff's Evidence Would Not Have Changed the Outcome**

Even if Plaintiff's evidence satisfied the first two prongs of the "newly discovered evidence" test under Rules 59(e) and 60(b)(2), it would not satisfy the last prong of materiality.  Newly discovered evidence must be material and cannot be merely cumulative or impeaching.  *Feature Realty, Inc. v. City of Spokane*, 331

23

F.3d 1082, 1093 (9th Cir. 2003) (denying reconsideration under Rule 60(b)(2)). "[T]he newly discovered evidence must be of such magnitude that production of it earlier would have been likely to change the disposition of the case." *Coastal Transfer Co. v. Toyota Motor Sales, U.S.A.*, 833 F.2d 208, 211 (9th Cir. 1987). This is not the case here.

First, the proffered evidence is consistent with Defendant's position at summary judgment that the 2001 Agreement provided for "a comprehensive, unlimited corpus of rights that, necessarily, includes any inventive rights embodied in the patents-in-suit." (Defendant's Motion for Summary Judgment at 5:22-25.) Plaintiff's argument for reconsideration is cumulative of its argument at summary judgment that the 2001 Agreement necessarily concerned *either* the Patents *or* unpatented methodologies distinct and different from the Patents. For example, Plaintiff argued in its Statement of Genuine Disputes ("GD") that "Chester Wang was aware that the 'methodologies' referenced in the 2001 Agreement were patented methods and that Plaintiff was the rightful owner of such patents . . . ." (GD at 11:4-6.) Plaintiff's counsel further argued at the May 8, 2012 hearing that "I think that the intent of the parties at the time they contracted . . . was that the patents would be licensed to Dolphin for use in the software." (May 8 Transcript at 19:5-8.)

Second, the proffered evidence is cumulative of the evidence the Court cited in support of its finding that "[t]he methodologies described in the 2001 Agreement are some of the methodologies covered by the [Patents]." (Aug. 10 Order at 6:25-28.) *See also Zila, Inc. v. Tinnell,* 502 F.3d 1014, 1025 (9th Cir. 2007) (contract providing for royalties on sales of the "invention" included but was not limited to royalties on patent).

As the Court's August 10 Order made clear, whether an agreement is a patent license is a legal question governed by ordinary principles of contract interpretation. *Jazz Photo Corp. v. Int'l Trade Comm'n*, 264 F.3d 1094, 1108 (Fed.

Cir. 2001) (citations omitted) ("Whether express or implied, a license is a contract governed by ordinary principles of state contract law."); *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 703 (Fed. Cir. 1992) ("[A]s in other areas of commerce, private parties may contract [with regard to patents] as they choose . . . ."). The mere inclusion of patented material in contractual terms is insufficient, without more, to imply a patent license. *See Claiborne-Reno Co. v. E.I. Du Pont de Nemours & Co.*, 77 F.2d 565, 567 (8th Cir. 1935); *Standard Sewing Mach. Co. of Ohio v. Jones*, 260 F. 170, 173 (3d Cir. 1919) (no implied patent license merely because the subject matter of the contract is patented).

Finally, in its August 10 Order, the Court found : "(1) communication or action by the patentee indicating that the alleged infringer will not be disturbed in his activities; (2) reliance by the alleged infringer on the patentee's conduct; [and] (3) material prejudice by the alleged infringer if the patentee is allowed to proceed." (Aug. 10 Order at 10:27-11:3(citation omitted).) *See also Raber v. Pittway Corp.*, No. C 92-2581 FMS, 1994 WL 374542, at *5 (N.D. Cal. July 11, 1994) (Smith, J.) The proffered evidence in support of reconsideration further supports the Court's conclusion that PDS may invoke an equitable estoppel defense against Plaintiff. (Aug. 10 Order at 10:25-27.)

The Court finds that Plaintiff has failed to show that its proffered evidence is material and would have been likely to change the disposition of the case.

## II.    Local Rule 7-18

Consistent with Fed. R. Civ. P. 59(e) and 60(b), the Court finds that Plaintiff has failed to show that reconsideration is necessary pursuant to Local Rule 7-18.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Reconsideration is hereby **DENIED**. [Docket No. 97.]

**IT IS SO ORDERED.**

Dated: April 5, 2013      By: _____

           HONORABLE CONSUELO B. MARSHALL

           United States District Court Judge

## <u>CERTIFICATE OF SERVICE</u>

I, Roger N. Behle, Jr., the undersigned counsel for Plaintiff-Appellant Arnett

Facial Reconstruction Courses, Inc., hereby certify that I served a copy of the

Corrected Appellant's Brief on counsel of record by Electronic Means (by email or

CM/ECF) on July 2, 2013.

**FOLEY BEZEK BEHLE & CURTIS, LLP**

By: /s/ Roger N. Behle, Jr.
Roger N. Behle, Jr.
*Attorneys for Plaintiff-Appellant*
*Arnett Facial Reconstruction Courses, Inc.*
575 Anton Blvd., Suite 710
Costa Mesa, CA 92626
rbehle@foleybezek.com
(714) 556-1700

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,382 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14 point font.

DATED: July 2, 2013                  **FOLEY BEZEK BEHLE & CURTIS, LLP**

By: /s/ Roger N. Behle, Jr.
Roger N. Behle, Jr.
*Attorneys for Plaintiff-Appellant*
*Arnett Facial Reconstruction Courses, Inc.*
575 Anton Blvd., Suite 710
Costa Mesa, CA 92626
rbehle@foleybezek.com
(714) 556-1700